UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
HUGHE JEAN-CHARLES, and AUDREY
JEAN-CHARLES on behalf of themselves and on
behalf of their infant children RJC and DJC,

|  |  |
|---|---|
| Plaintiffs, | REPORT AND RECOMMENDATION |
| -against- | 21 CV 3803 (DG)(RML) |

THE CITY OF NEW YORK, ADRIAN
GONZALES, DELANO CONNOLLY,
CHRISTOPHER MIRABELLA, SUCCESS
ACADEMY CHARTER SCHOOLS, INC.,
SUCCESS ACADEMY CHARTER
SCHOOLS – NYC, and VAILARIE EUBANKS,

                    Defendants.
------------------------------------------------------------X
LEVY, United States Magistrate Judge:

By order dated June 29, 2023, the Honorable Diane Gujarati, United States

District Judge, referred defendants' motions to dismiss to me for report and recommendation.

For the reasons stated below, I respectfully recommend that the motions be granted in part and

denied in part.

## BACKGROUND

Plaintiffs Hughe and Audrey Jean-Charles (the "parents" or "plaintiffs")

commenced this action on July 7, 2021, against the City of New York, Kings County Assistant

District Attorney Christopher Mirabella ("ADA Mirabella"), New York City Administration for

Children's Services ("ACS") attorney Connolly Delano, and ACS caseworker Adrian Gonzales

(collectively, the "City defendants") and Success Academy Charter Schools, Inc., Success

Academy Charter Schools – NYC, and Vailarie Eubanks (collectively, the "Success defendants"

or with the City defendants, "defendants").  (Complaint, dated July 7, 2021, Dkt. No. 1; see also

Second Amended Complaint, filed Nov. 28, 2022 ("SAC"), Dkt. No. 20.)  On behalf of themselves and their infant children, "RJC" and "DJC" (together, the "children," or with the parents, "plaintiffs"), plaintiffs assert twelve claims for relief stemming from allegations that the City defendants maliciously prosecuted Mr. Jean-Charles after the Success defendants reported Mr. Jean-Charles to authorities for potential child abuse and Mrs. Jean-Charles for potential neglect.  (SAC ¶ 3.)

        At the time relevant to this action, RJC was seven years old and enrolled in the second grade at a Success Academy school in Bergen Beach, Brooklyn, and his brother, DJC, was three years old and attended a nearby pre-school.  (Id. ¶¶ 13, 14.)  In January 2017, Success Academy told plaintiffs that it believed RJC had learning disabilities and that he should be evaluated and classified as having learning disabilities.  (Id. ¶¶ 24, 28.)  Plaintiffs objected to the classification and refused to consent to an evaluation.  (Id. ¶ 25.)  Plaintiffs allege that, shortly thereafter, the Success defendants began a "sustained campaign to harass the family and push RJC out of the school."  (Id. ¶ 26.)  According to plaintiffs, RJC's teacher, assistant teacher, and acting principal called Mrs. Jean-Charles on a near-daily basis to complain about minor or everyday matters pertaining to her son, such as fidgeting in his seat, not following directions in the classroom, or because he was not sufficiently attentive.  (See id. ¶ 27.)  These types of calls were uncommon during the two-and-a-half years that RJC had attended Success Academy prior to January 2017, which plaintiffs assert indicated to them that RJC was no longer welcome at the school and that the school wanted RJC to enroll elsewhere.  (Id. ¶¶ 28, 29.)[1]

---

[1] Plaintiffs further contend that this demonstrates that Success Academy has an established policy and practice of pushing out children who underperform, have learning disabilities, or are perceived as having learning disabilities.  (SAC ¶¶ 32, 33.)  Because Success Academy is a publicly funded charter school, it admits students based on a lottery system and is required to provide a seat to any enrolled child unless the student voluntarily withdraws or is expelled.  (Id. ¶ (Continued . . .)

On March 13, 2017, plaintiffs received one such call in which Success Academy personnel informed plaintiffs that RJC had misbehaved by using offensive language.  (Id. ¶ 38.) The following day, plaintiffs allege that as discipline for misbehaving at school, RJC was told by his parents that he could not have his favorite food and was instead given oatmeal.  (Id. ¶ 39.) According to plaintiffs, "RJC objected, thew his oatmeal in the garbage, and ran upstairs.  While running, RJC tripped and fell, slightly bruising his upper lip."  (Id.)  RJC then returned to school on March 15, 2017 with a swollen upper lip.  (Id. ¶ 40.)  Defendant Eubanks, acting principal at the time, asked RJC about his swollen lip and RJC responded that his father had beaten him for acting out in school.  (Id. ¶ 41.)  Eubanks then reported RJC's statements and her suspicion that RJC had been abused to state authorities.  (Id. ¶ 44.)  Defendant Gonzalez, ACS caseworker at the time, responded to the call, went to the school, and interviewed RJC without contacting his parents.  (Id. ¶¶ 48, 49.)[2]  Gonzalez subsequently contacted Mr. and Mrs. Jean-Charles and told them to come to the school with DJC.  (Id. ¶ 59.)  Upon their arrival, plaintiffs were not permitted to speak with RJC and were informed that the family had to "go 'downtown' with [Gonzalez] to be interrogated about RJC . . . without explaining what the matter was about or concerning."  (Id. ¶ 60.)

---

34.)  Furthermore, Success Academy must comply with strict and extensive regulatory guidelines under New York Education Law § 3214 to expel or suspend a student on a long-term basis.  (Id. ¶ 35.)  Rather than comply with § 3214, plaintiffs contend that Success Academy pushes out students by "making their parents' lives so difficult that they withdraw," which they typically do by way of threats of suspension, suspension, and actual or threatened calls to 911 or ACS.  (Id. ¶¶ 35, 36.)

[2] Plaintiffs allege that school authorities and Gonzalez used leading and suggestive questioning techniques to encourage RJC to make up a "facially fanciful story" regarding the alleged beating that was not supported by any physical evidence aside from RJC's "slightly swollen lip."  (Id. ¶¶ 41-43, 51.)

Once at ACS offices, Gonzalez and other ACS personnel interviewed the family. Mr. Jean-Charles was subsequently arrested on suspicion of child abuse and the children were released to Mrs. Jean-Charles' custody. (Id. ¶¶ 71-76.) The following day, ACS filed an emergency Neglect Petition in Family Court requesting an order removing custody of the children from plaintiffs. (Id. ¶¶ 79, 80.) The Family Court then issued an order removing custody of the two children from their parents and temporarily placing physical custody with their paternal aunt. (Id. ¶ 81.) The next day, on March 17, 2017, the Family Court issued an order of protection directing Mr. Jean-Charles to stay away from the children but modifying the prior order to allow the children to return to Mrs. Jean-Charles' custody. (Id. ¶¶ 84, 85.) As a result of the Family Court orders, Mr. Jean-Charles was required to move out of the family home. (Id. ¶ 86.) For a total of 125 days, Mr. Jean-Charles was not permitted to live at home with his family and was only permitted limited and supervised visitation. (Id. ¶¶ 90, 91.)

In June 2017, ADA Mirabella requested that Mrs. Jean-Charles permit him to interview RJC privately in connection with the criminal case against Mr. Jean-Charles. (Id. ¶ 104.) Mrs. Jean-Charles objected to his request and informed ADA Mirabella that RJC had his own attorney who should be contacted. (Id.) Against the wishes of Mrs. Jean-Charles, ADA Mirabella allegedly went to RJC's school and, with the assistance of Success Academy personnel, interrogated RJC, obtained a "supporting deposition" from RJC, and forced RJC to sign a statement implicating his father in a crime. (See id. ¶¶ 105-09.) Later that month, RJC withdrew from Success Academy and enrolled in a different elementary school. (Id. ¶ 110.)

Mr. Jean-Charles was allowed to return home in late July 2017, the criminal case against him was dismissed in August 2017, and the Family Court proceedings were adjourned in contemplation of dismissal in October 2017 and ultimately dismissed on April 2, 2018, provided

that plaintiffs agreed to continued ACS supervision and continued to abide by a limited order of protection prohibiting any corporal punishment of the children. (Id. ¶¶ 111-13.) On June 13, 2018, after a hearing before an administrative law judge of the New York State Office of Children and Family Services, the initial finding of abuse based on an "indicated" finding, triggered by the report of abuse by defendant Eubanks to the New York State Central Register, was reversed. (Id. ¶ 114.)

In sum, plaintiffs allege that the abuse and neglect allegations made against them were driven by racist stereotypes and were patently false. (See Letter re: Pre-Motion Conference Request, dated Jan. 25, 2023, Dkt. No. 28, at 1-2.) Plaintiffs further allege that because of these false allegations, the Jean-Charles family was damaged by the subsequent events that took place in the spring and summer of 2017, i.e., "their arrests and custodian interrogations; the grant of a petition to remove parental custody of their two young children; the grant of an order of the Family Court that required the father to vacate the home for 125 days; the criminal prosecution of the father; and the suspension of the father's ability to work as a doctor in the physical therapy field." (Id. at 2.) Defendants move to dismiss the Second Amended Complaint in its entirety. (See City Defendants' Memorandum of Law in Support of their Motion to Dismiss, dated Apr. 17, 2023 ("City Mem."), Dkt. No. 45, at 2; Success Defendants' Memorandum of Law in Support of their Motion to Dismiss, dated Apr. 17, 2023 ("Success Mem."), Dkt. No. 48, at 1.)[3]

## LEGAL STANDARD

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiffs'

---

[3] Plaintiffs agree to withdraw the twelfth claim for breach of fiduciary duty. (See Plaintiffs' Memorandum of Law in Opposition to the Defendants' Motions to Dismiss, dated May 22, 2023, Dkt. No. 44, at 7.) I therefore recommend that the breach of fiduciary duty claim be dismissed.

favor.  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007).  The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient."  Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  A complaint will survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id.  The assessment of whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 679.

## DISCUSSION

Defendants contend that plaintiffs' claims are time-barred, because when they filed this action on July 7, 2021, various statutes of limitations had expired.  (City Mem. at 8-11; Success Mem. at 6-9.)  Additionally, the Success defendants assert that plaintiffs' state law claims are barred for failing to file a notice of claim.  (Success Mem. at 8.)  Plaintiffs argue that none of their claims are time-barred, because the children's claims are tolled by N.Y. C.P.L.R. § 208 and the parents' claims should be equitably tolled due to repeated threats that they would lose custody of their children if they failed to cooperate with ACS.  (Plaintiffs' Memorandum of Law in Opposition to the Defendants' Motions to Dismiss, dated May 22, 2023 ("Pls.' City Opp."), Dkt No. 44, at 17-21; Plaintiffs' Memorandum of Law in Opposition to the Defendants' Motions to Dismiss, dated May 22, 2023 ("Pls.' Success Opp."), Dkt. No. 49, at 17-21.)  Finally, defendants argue that plaintiffs have failed to state all of their claims and that the individual defendants are entitled to immunity.  (See City Mem. at 11-23; Success Mem. at 10-23.)

6

## I.      Tolling

Defendants argue that each of plaintiffs' claims accrued, at the latest, when the charges against Mr. Jean-Charles were dismissed in August 2017 because, by then, plaintiffs knew the critical facts of the disruption to their family.  (City Mem. at 9; Success Mem. at 6.) Accordingly, defendants contend that the statute of limitations for this claim expired in March 2021,[4] at the latest.  (City Mem. at 9; Success Mem. 6-8.)  Plaintiffs do not dispute that their claims were brought outside of several statutes of limitations.  Instead, they argue that the limitations periods should be equitably tolled during the period of March 15, 2017 to June 13, 2018, when New York State's finding of abuse was reversed, "because the Jean-Charles family should not be held responsible for filing its claims in this case while there was a real and substantial threat to the integrity, wellbeing, and livelihood of their family."  (Pls.' City Opp. at 19; Pls.' Success Opp. at 19.)

New York law tolls applicable statutes of limitations when a plaintiff is incapacitated by infancy.  N.Y. C.P.L.R. § 208.  An "infant" is defined as one who has not attained eighteen years of age.  N.Y. C.P.L.R. § 105(j).  RJC and DJC are still under the age of eighteen; therefore, all limitations periods related to their claims are tolled by § 208 and their claims in this action are timely.  Defendants do not dispute this.  As to the parents' claims, "[e]quitable tolling is a doctrine that permits courts to extend a statute of limitations on a case-by-case basis to prevent inequity."  Warren v. Garvin, 219 F.3d 111, 113 (2d Cir. 2000). Granting equitable tolling is a discretionary "exercise of a court's equity powers."  Holland v. Florida, 560 U.S. 631, 649 (2010).  However, this discretion is not absolute.  "Before a court may exercise discretion to grant equitable tolling, a litigant must demonstrate as a factual matter

---

[4] Defendants concede that Executive Order 202.8 tolled all statutes of limitations for plaintiffs' claims by 228 days.  (City Mem. at 8, n.3; Success Mem. at 8, n.1.)

the existence of two elements: first, 'that some extraordinary circumstance stood in [his or her] way' and second 'that [he or she] has been pursuing [his or her] rights diligently.'" Doe v. United States, 76 F.4th 64, 71 (2d Cir. 2023) (quoting A.Q.C. ex rel. Castillo v. United States, 656 F.3d 135, 144 (2d Cir. 2011)).

Equitable tolling applies "only in rare and exceptional circumstances." Billeris v. Inc. Vill. of Bayville, New York, No. 20 CV 3298, 2023 WL 6214108, at *7 (E.D.N.Y. Sept. 25, 2023) (quoting Jones v. City of New York, 846 F. App'x 22, 24 (2d Cir. 2021)). "A plaintiff must demonstrate not only that an extraordinary circumstance existed, but also must further demonstrate that those circumstances caused [him or her] to miss the original filing deadline." Id. (internal quotation marks and citation omitted). "Among the extraordinary reasons that may justify equitable tolling of a statute of limitations is a defendant's efforts to threaten or retaliate against a plaintiff if [he or she] files a claim against [the defendant]." Clark v. Hanley, No. 18 CV 1765, 2022 WL 124298, at *4 (D. Conn. Jan. 13, 2022); see also Roeder v. J.P. Morgan Chase & Co., 523 F. Supp. 3d 601, 616 (S.D.N.Y. 2021) (finding equitable estoppel "estops the defendant/wrongdoer who has taken affirmative steps to prevent a plaintiff from bringing a claim within the limitations period from arguing that the plaintiff is at fault and should be precluded from bringing a claim for failure to bring it within that limitations period") (citation and internal quotation marks omitted), aff'd, No. 21 CV 552, 2022 WL 211702 (2d Cir. Jan. 25, 2022).

Plaintiffs argue that the statutes of limitations related to their claims should be equitably tolled because "Gonzalez repeatedly threatened to take custody of the Children if the Parents failed to cooperate with him." (Pls.' City Opp. at 19.) However, these threats did not have anything to do with concealing from plaintiffs that they might have a cause of action or preventing them from filing a lawsuit. Defendants' alleged threats instead related to taking

8

custody of the children if the parents did not cooperate with the proceedings filed against them, not if the parents themselves filed a lawsuit or contested the allegations of abuse or neglect in Family Court.  See Davis v. Whillheim, No. 17 CV 5793, 2019 WL 935214, at *7 (S.D.N.Y. Feb. 26, 2019) ("Plaintiff's proceedings in Family Court had no effect on his ability to initiate the instant action at an earlier date.  To the contrary, his participation in the Family Court proceedings indicates that he had contemporaneous knowledge of the harm suffered[.]").  For example, defendant Gonzalez told Mrs. Jean-Charles "that if she did not accompany Gonzalez with the children and Mr. Jean-Charles 'downtown' then he would simply take custody of the two very young children." (SAC ¶ 64.)  While such a threat is certainly upsetting, it does not constitute fraud, misrepresentation, or deception undertaken to prevent plaintiffs from filing a timely action.  Accordingly, I find that the parents' claims should not be equitably tolled.[5]

## II.    Statutes of Limitations

"A complaint may be dismissed as untimely under Federal Rule of Civil Procedure 12(b)(6) when a plaintiff's factual allegations demonstrate that relief would be barred by the applicable statute of limitations." Ines Figueroa v. Ponce De Leon Fed. Bank, No. 11 CV 7633, 2012 WL 3264552, at *1 (S.D.N.Y. Aug. 10, 2012) (citing Jones v. Bock, 549 U.S. 199, 214-15 (2007)).  Since RJC and DJC's claims are tolled due to their infancy, I will address only whether the parents' claims are timely based on the applicable statutes of limitations.

---

[5] Moreover, plaintiffs allege only that these threats were made by defendant Gonzalez, who was replaced as the family's caseworker in June 2017.  (See id. ¶ 99.)  Therefore, even if defendant Gonzalez's threats were considered an extraordinary reason justifying equitable tolling, those threats ceased when he was replaced in June 2017 and would have only tolled the parents' claims up to that time.  See Abbas v. Dixon, 480 F.3d 636, 642 (2d Cir. 2007) ("The plaintiff bears the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel claim 'have ceased to be operational.'") (citation omitted).  As discussed in further detail below, this would not save the parents' claims from being untimely.

a.  Section 1983 Claims

Plaintiffs' first eight claims arise under 42 U.S.C. § 1983.  (See SAC ¶¶ 117-160.)
In an action arising in New York pursuant to Section 1983, New York's general statute of
limitations for personal injury actions, which is three years, supplies the applicable statute of
limitations.  See Pearl v. City of Long Beach, 296 F.3d 76, 79 (2d Cir. 2002) (citing N.Y.
C.P.L.R. § 214(5)).  While the applicable limitations period is determined by state law, the
accrual date "is a question of federal law."  Wallace v. Kato, 549 U.S. 384, 388 (2007); see also
Pearl, 296 F.3d at 80 ("Federal law determines when a section 1983 cause of action accrues.").
"A Section 1983 claim ordinarily accrues when the plaintiff knows or has reason to know of the
harm."  Shomo v. City of New York, 579 F.3d 176, 181 (2d Cir. 2009) (internal quotation marks
and citations omitted).

"An accrual analysis begins with identifying the specific constitutional right
alleged to have been infringed."  McDonough v. Smith, 139 S. Ct. 2149, 2155 (2019) (internal
quotation marks and citations omitted).  "Aspects of § 1983 which are not governed by reference
to state law are governed by federal rules conforming in general to common-law tort principles."
Wallace, 549 U.S. at 388 (citations omitted).  "Under those principles, it is the standard rule that
[accrual occurs] when the plaintiff has a complete and present cause of action, that is, when the
plaintiff can file suit and obtain relief[.]"  Id. (internal quotation marks and citations omitted).
Furthermore, "[t]he Supreme Court has instructed that in section 1983 actions, we borrow not
only a state's limitations period but also its 'tolling rules,' unless applying the state's tolling rules
'would defeat the goals of the federal statute at issue[.]'"  Pearl, 296 F.3d at 80 (citations
omitted) (applying N.Y. C.P.L.R. § 208 rule of tolling during infancy).  Thus, plaintiffs' claims
arising under Section 1983 are subject to a three-year statute of limitations, began accruing when

they knew or had reason to know of the harm, and are subject to tolling under § 208 and Executive Order 202.8.

Plaintiffs' first and second claims, for the rights to family integrity and due process, are identical except that the due process claim is also brought under the Fourth and Fourteenth Amendments.  (See SAC ¶¶ 117-27.)  The right to family integrity claim began to accrue at the latest in July 2017, when Mr. Jean-Charles returned home.  The due process claim accrued at the latest when the Criminal Court claims against Mr. Jean-Charles were dismissed in August 2017 because by that point, the family knew the critical facts related to the disruption of their family.

Plaintiffs' third claim, for the right against unlawful seizure, began to accrue on March 15, 2017, when the alleged unlawful seizure occurred.  (See SAC ¶¶ 129-30); see also Dominguez v. Hendley, 545 F.3d 585, 589 (7th Cir. 2008) ("Fourth Amendment claims for false arrest or unlawful searches accrue at the time of (or termination of) the violation.").  Plaintiffs' fourth claim, for the right to counsel and to remain silent, accrued on June 9, 2017, when defendant Mirabella allegedly forced RJC to sign a statement implicating his father in a crime, which is the latest action pleaded for this claim.  (See SAC ¶¶ 105-09.)  Plaintiffs' fifth claim, for stigma-plus, began to accrue when the criminal proceedings against Mr. Jean-Charles were dismissed in August 2017.  See Woodley v. City of New York, No. 09 CV 5709, 2010 WL 1713608, at *1 (E.D.N.Y. Apr. 28, 2010) ("It is not necessary for a plaintiff to have suffered all possible injuries before his stigma-plus claim accrues; rather, a claim accrues even if some of the consequences of the stigmatizing allegations are potential and contingent.").  Accordingly, the

statute of limitations for plaintiffs' first five claims expired in March 2021 at the latest and I

recommend that they be dismissed as untimely as to the parents.[6]

   In addition to § 1983, plaintiffs' sixth claim, for race discrimination, is brought

under the Equal Protection Clause of the Fourteenth Amendment.  (See SAC ¶ 142.)[7]  "The same

three-year statute of limitations applies to the equal protection claim."  Billeris v. Inc. Vill. of

Bayville, New York, No. 20 CV 03298, 2023 WL 6214108, at *8 (E.D.N.Y. Sept. 25, 2023)

(citing Tang v. Visnauskas, 847 F. App'x 24, 27 (2d Cir. 2021) (dismissing equal protection

claim, asserted through Section 1983, as barred by three-year statute of limitations)).  This claim

began to accrue on March 17, 2017, when the Family Court issued an order of protection based

on the allegedly discriminatory actions taken by ACS.  (See SAC ¶ 84); see also Russell v. Cnty.

of Nassau, 696 F. Supp. 2d 213, 229 (E.D.N.Y. 2010) ("the timeliness of a discrimination claim

is measured from the date the claimant receives notice of the allegedly discriminatory

decision.").  Therefore, taking into account Executive Order 202.8, the statute of limitations for

---

[6] However, the facts giving rise to plaintiffs' fifth claim, stigma-plus right to liberty and livelihood, only involves Mr. Jean-Charles and none of the other plaintiffs in this action. Therefore, it is not tolled by § 208 and I recommend that it be dismissed as to all plaintiffs.

[7] Plaintiffs also bring this claim under § 1981.  "The statute of limitations for claims brought under § 1981, as amended by the Civil Rights Act of 1991, is four years."  Bowen-Hooks v. City of New York, 13 F. Supp. 3d 179, 209 (E.D.N.Y. 2014) (citing Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382 (2004)).  However, in Duplan v. City of New York, the Second Circuit held that "§ 1981 does not provide a separate private right of action against state actors."  888 F.3d 612, 621 (2d Cir. 2018); see also Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733 (1989) ("the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units").  The Second Circuit reached this conclusion because it found that § 1983 already provided a remedy against state actors and that therefore, "there is no reason to infer from the rights-conferring language of § 1981(c) that it creates an additional, and duplicative, remedy."  Duplan, 888 F.3d at 620-21; see also Gonzalez v. City of New York, 377 F. Supp. 3d 273, 284 (S.D.N.Y. 2019) (affirming dismissal of § 1981 claim asserted by plaintiff to benefit from the four-year statute of limitation under § 1981 versus the shorter statute of limitation under § 1983).  I therefore recommend that the § 1981 claim be dismissed for failure to state a claim.

this claim under § 1983 and the Equal Protection Clause expired on October 31, 2020, and the claim is untimely as it pertains to the parents. Accordingly, I recommend that the parents' claim for race discrimination be dismissed.

Plaintiffs' seventh and eighth claims, for malicious prosecution and malicious abuse of process, arise under § 1983 as well as New York state and common law. As discussed above, a three-year statute of limitations applies to the § 1983 claim. However, "New York's one-year statute of limitations govern[s] malicious prosecution and abuse of process claims." Kanciper v. Lato, 989 F. Supp. 2d 216, 235 (E.D.N.Y. 2013) (citing N.Y. C.P.L.R. § 215(3) (malicious prosecution claim must be commenced within one year)); Benyo v. Sikorjak, 858 N.Y.S.2d 215, 218 (2d Dep't 2008) ("Abuse of process is an intentional tort and, thus, is governed by a one-year statute of limitations."). "[C]laims for malicious prosecution and abuse of process do not accrue until the underlying action which is the basis for the claim is terminated in the plaintiff's favor by dismissal." TADCO Constr. Corp. v. Dormitory Auth. of New York, 700 F. Supp. 2d 253, 273 (E.D.N.Y. 2010); see also McDonough, 139 S. Ct. at 2156 (same).

Plaintiffs allege that defendants are liable for malicious prosecution and abuse of process arising from the proceedings initiated by defendants in criminal court, Family Court, and the New York State Office of Children and Family Services and the New York State Family Register. (See SAC ¶¶ 152, 158.) However, New York State law requires a plaintiff to prove "the initiation or continuation of a *criminal* proceeding against plaintiff" in order to state a claim for malicious prosecution. Davis, 2019 WL 935214, at *11 (quoting Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997)) (emphasis added). Therefore, this claim began to accrue when the criminal case against Mr. Jean-Charles was dismissed in August 2017, and the statute of limitations expired in March 2021.

As to the abuse of process claim, "[t]he distinction between civil and criminal abuse of process is critical for section 1983 purposes." Wagner v. Hyra, 518 F. Supp. 3d 613, 627 (N.D.N.Y. 2021) (quoting Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994)).  As the Second Circuit has explained, "[p]rocedural due process forbids the use of legal process for a wrongful purpose."  Cook, 41 F.3d at 80.  "In the criminal context, malicious abuse of process is by definition a denial of procedural due process."  Id. (cleaned up).  However, "Section 1983 liability may not be predicated on a claim of malicious abuse of *civil* process."  Alroy v. City of N.Y. Law Dep't, 69 F. Supp. 3d 393, 402 (S.D.N.Y. 2014) (emphasis in original).  Therefore, plaintiffs' abuse of process claim as it pertains to the civil proceedings is subject only to New York's one-year statute of limitations, not the three-year statute of limitations provided by Section 1983.  The abuse of process claim began to accrue at the latest on April 2, 2018, when the Family Court proceedings against Mr. Jean-Charles were dismissed, and the claim expired in November 2019 at the latest.  Similar to the malicious prosecution claim, the statute of limitations for the abuse of process claim as it pertains to the criminal proceedings expired in March 2021.  Therefore, I find that both claims are untimely and recommend that they be dismissed as to all plaintiffs.[8]

b. Disability Discrimination Claim under Federal and Local Law

Plaintiffs' ninth claim arises under the Americans with Disabilities Act ("ADA") and the New York City Human Rights Law ("NYCHRL").  The ADA does not contain a statute of limitations.  Instead, courts in this district apply New York's three-year statute of limitations

---

[8] The facts giving rise to these claims do not involve RJC or DJC because neither the criminal proceedings nor the Family Court proceedings were brought against RJC or DJC.  Therefore, I recommend that they be dismissed as to all plaintiffs.  Additionally, as discussed in further depth below, plaintiffs' state law claim for malicious abuse of process is subject to notice of claim requirements and should be dismissed for failure to comply with those requirements.

for personal injury claims in determining the appropriate time constraints for claims brought pursuant to the ADA. See Shomo, 2005 U.S. Dist. LEXIS 5488, at *18-19; Hunt v. Meharry Med. College, No. 98 CV 7193, 2000 U.S. Dist. LEXIS 7804, at *15 (S.D.N.Y. June 6, 2000). Claims arising under the NYCHRL are similarly subject to a three-year statute of limitations. See Bermudez v. City of New York, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011) (citing Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 238 (2d Cir. 2007) (applying three-year statute of limitations to claims under the NYCHRL)).

The facts giving rise to this claim only apply to RJC. (See SAC ¶ 163 ("The School Defendants are jointly and severally liable to the Plaintiffs on the ground that they intentionally discriminated against RJC on the grounds that he was perceived to have a learning disability that substantially limited his ability to learn and to read and was disabled[.]").) Because RJC has not reached the age of eighteen, this claim is tolled by § 208 and is timely. However, I recommend that it be dismissed as untimely as to the parents because the latest fact related to this claim occurred in June 2017 when RJC withdrew from Success Academy as a student and the statute of limitations expired in January 2021 at the latest. (See id. ¶ 110.)

### III.    Notice of Claim

Plaintiffs' eighth, tenth, and eleventh claims, for malicious abuse of process, intentional infliction of emotional distress and recklessness, gross negligence, and negligence, arise under state tort law. New York law requires plaintiffs to file a notice of claim prior to commencement of an action founded upon tort law against a school district, a school district's employees, or against a public corporation or any officer, appointee or employee thereof, within ninety days after the claim arises and to commence the action within a year and ninety days from the date on which the cause of action accrues. L.K. v. Sewanhaka Cent. High Sch. Dist., No. 14

CV 5730, 2015 WL 12964663, at *15 (E.D.N.Y. July 16, 2015); N.Y. GEN. MUN. L. § 50-e; N.Y. EDUC. L. § 3813. "This requirement has been extended to charter schools." Lawton v. Success Acad. Charter Sch., Inc., 323 F. Supp. 3d 353, 368 (E.D.N.Y. 2018) (citing Rodriguez v. Int'l Leadership Charter Sch., No. 08 CV 1012, 2009 WL 860622, at *6 (S.D.N.Y. Mar. 30, 2009)). Failure to comply with this requirement is a "fatal defect." Scaggs v. N.Y. State Dep't of Educ., No. 06 CV 799, 2007 WL 1456221, at *19 (E.D.N.Y. May 16, 2007) (quoting Parochial Bus Sys., Inc. v. Bd. of Educ., 60 N.Y.2d 539, 547 (N.Y. 1983)). Plaintiffs do not allege that they filed any notice of claim.

"The time limitations in N.Y. Gen. Mun. L. § 50-e and 50-i are subject to the tolling provisions of CPLR § 208." Marshall v. Downey, No. 09 CV 1764, 2010 WL 5464270, at *7 (E.D.N.Y. Dec. 27, 2010); see also Henry v. City of New York, 94 N.Y.2d 275, 280 (N.Y. 1999) (applying C.P.L.R. § 208's tolling provisions to N.Y. Gen. Mun. L. § 50–i); Barnes v. Onondaga Cnty., 65 N.Y.2d 664, 666 (N.Y. 1985) (permitting a late notice of claim to be filed where plaintiff fell within the meaning of § 208). However, "[f]ederal courts do not have jurisdiction to hear state law claims brought by plaintiffs who have failed to comply with the notice of claim requirement, nor can a federal court grant a plaintiff permission to file a late notice of claim." Dingle v. City of New York, 728 F. Supp. 2d 332, 348-49 (S.D.N.Y. 2010) (collecting cases). Instead, plaintiffs' state law claims should be dismissed without prejudice to reinstatement should plaintiffs obtain leave to file a late notice of claim from the appropriate state court. See, e.g., Kearse v. Aini, No. 19 CV 1579V, 2023 WL 2615894, at *3 (W.D.N.Y. Jan. 31, 2023) (recommending the same), report and recommendation adopted, 2023 WL 2612581 (W.D.N.Y. Mar. 23, 2023); Brown v. Metropolitan Transp. Auth., 717 F. Supp. 257, 260 (S.D.N.Y. 1989) ("Until the state legislature amends § 50-e(7) to include federal trial courts,

we have no choice but to dismiss for lack of jurisdiction plaintiff's application to file a late

notice of claim."). Therefore, I recommend that plaintiffs' eighth, tenth, and eleventh claims be

dismissed without prejudice to reinstatement in the event they are granted leave to file a late

notice of claim from an appropriate state court.

IV.    **Remaining Claims**

As a result of my recommendations above, the claims that remain are as follows:

the first four claims as they pertain to RJC and DJC, the sixth claim as it pertains to RJC and

DJC under § 1983 and the Equal Protection Clause, and the ninth claim as it pertains to RJC. I

will discuss whether these claims are properly stated.

a.    Section 1983 Claims

To establish a § 1983 claim, plaintiffs must demonstrate "that the challenged

conduct (1) was attributable to a person acting under color of state law, and (2) deprived [them]

of a right, privilege, or immunity secured by the Constitution or laws of the United States."

Whalen v. Cnty. of Fulton, 126 F.3d 400, 405 (2d Cir. 1997).

i.    *Monell Liability*

First, it must be noted that a municipality cannot be held liable under § 1983 on a

theory of *respondeat superior*. Monell v. N.Y. City Dep't of Soc. Servs., 436 U.S. 658, 691

(1978). A § 1983 claim can only be brought against a municipality if the action that is alleged to

be unconstitutional was the result of an official policy or custom. Id. at 691, 694-95. Thus, a

plaintiff must allege that such a municipal policy or custom is responsible for his or her injury.

Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 403-04 (1997). Similarly, "[a]

school district's liability under Monell may be premised on any of three theories: (1) that a

district employee was acting pursuant to an expressly adopted official policy; (2) that a district

employee was acting pursuant to a longstanding practice or custom; or (3) that a district

17

employee was acting as a 'final policymaker.'" Hurdle v. Bd. of Educ. of City of New York, 113 F. App'x 423, 424-25 (2d Cir. 2004) (quoting Lytle v. Carl, 382 F.3d 978, 982 (9th Cir. 2004)) (internal citations omitted).

The Second Circuit has established a two-pronged test for § 1983 claims brought against a municipality. "First, a plaintiff must 'prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer.'" Johnson v. City of New York, No. 06 CV 9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (quoting Vippolis v. Vill. of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985)). Second, the plaintiff must establish a causal connection between the policy or custom and the alleged deprivation of his or her constitutional rights. Id. (citing Brandon v. City of New York, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010)). To satisfy the first prong of the test on a motion to dismiss, a plaintiff must allege the existence of:

> (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials; or (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.

Moray v. City of Yonkers, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (internal citations and quotation marks omitted); see also Brandon, 705 F. Supp. 2d at 276-77.

Although a plaintiff is not required to identify an express rule or regulation to state a Monell claim, "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998) (quoting Ricciuti v. N.Y. City Transit Auth., 941 F.2d 119,

123 (2d Cir. 1991)) (internal quotation marks omitted); see also City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988) (plurality opinion) (explaining that only municipal officials who have "final policymaking authority" concerning the particular activities giving rise to a plaintiff's claims "may by their actions subject the government to § 1983 liability").

Plaintiffs only allege a policy or custom for Monell purposes related to their discrimination claims. (See SAC ¶¶ 32-36, 142-150; 163.) Accordingly, I recommend that claims one through three be dismissed against defendants City of New York, Success Academy Charter School Inc., and Success Academy Charter School – NYC. To establish Monell liability related to their race discrimination claim, plaintiffs assert that

> injuries to Plaintiffs were the direct and proximate result of de facto City policies and practices in existence at the time of the actions, which included, among other things: (a) long-standing and intentional practice of racism within the ranks of ACS; (b) City and ACS policymakers, who are predominately white, condoning, encouraging, and acquiescing in a longstanding and widespread practice among ACS personnel of targeting persons of color; (c) deliberate indifference and willful blindness by ACS and his executive staff to the fact that caseworkers were regularly employing racist stereotypes in the investigation and prosecution of allegations of abuse and neglect.

(SAC ¶ 149.) Plaintiffs allege specifically that "the City has a pattern and practice of employing racist stereotypes in the way that ACS acts toward Blacks[,]" and that "Gonzalez employed those racist stereotypes in connection with his conduct directed toward the Jean-Charles family." (Pls.' City Opp. at 38; see also SAC ¶¶ 58, 66-70.) Furthermore, plaintiffs allege that the City of New York and ACS's senior policymakers knew that officers and agents of ACS acted based on stereotyping of people of color, failed to take adequate steps to discipline its members who engaged in discriminatory conduct against persons of color, and as a result, the City is liable to plaintiffs for creating, fostering, and maintaining an "anything goes" policy and practice in terms of unfairly targeting persons of color. (SAC ¶¶ 145-47.)

19

Drawing all inferences in favor of plaintiffs, I find that they have adequately stated a claim for <u>Monell</u> liability based on alleged City policies of employing racist stereotypes in the investigation and prosecution of allegations of abuse and neglect under a failure to train/deliberate indifference theory.  <u>See, e.g.</u>, <u>Nicholson v. Scoppetta</u>, 344 F.3d 154 (2d Cir. 2003) (noting that the City can be liable simply by reason of its deliberate indifference to a known custom or practice of its employees by failing to train the employees to act otherwise and finding that the City was liable under § 1983 based on a failure to train ACS employees); <u>see also</u> <u>Davis v. City of New York</u>, 959 F. Supp. 2d 324, 364 (S.D.N.Y. 2013) (denying the City's motion for summary judgment on plaintiffs' equal protection claim and finding that the City's alleged racially discriminatory policies related to trespass enforcement in New York City Housing Authority buildings could form the basis for <u>Monell</u> liability).

Additionally, plaintiffs allege that Success Academy had policies and practices of pushing out underperforming children or children with learning disabilities and using harassing tactics to force students with actual or perceived learning disabilities to leave.  (SAC ¶¶ 32-36; Pls.' City Opp. at 39.)  Specifically, plaintiffs allege that they received calls from the Success defendants on a near-daily basis for two months with complaints of minor or everyday matters pertaining to RJC, to a point where it "became clear that the purpose of the repeated calls was to convince Mrs. Jean-Charles to withdraw RJC from the school[.]"  (SAC ¶¶ 27-29.)  Furthermore, plaintiffs allege that "[t]hreats of suspensions, suspensions, and actual or threatened calls to 911 or to ACS are typical means whereby Success Academy weeds out students and maintains high test scores."  (<u>Id.</u> ¶ 36.)  Again, drawing all inferences in plaintiffs' favor, I find that they have adequately stated a <u>Monell</u> claim based on Success Academy's alleged policy of pushing out underperforming children or children with learning disabilities and using harassing tactics to

force those children to leave.  See, e.g., S.G. v. Success Acad. Charter Sch., Inc., No. 18 CV 2484, 2019 WL 1284280, at *19 (S.D.N.Y. Mar. 20, 2019) (sustaining Monell claims against Success Academy for similar policy and practice).

ii.  *Family Integrity & Due Process*

It has long been settled in this Circuit "that a parent's interest in the custody of a child [is] a constitutionally protected liberty interest subject to due process protection." Cecere v. City of New York, 967 F.2d 826, 829 (2d Cir. 1992).  "[C]hildren have a parallel constitutionally protected liberty interest in not being dislocated from the emotional attachments that derive from the intimacy of daily family association."  Kia P. v. McIntyre, 235 F.3d 749, 759 (2d Cir. 2000) (brackets and internal quotation marks omitted); see also Duchesne v. Sugarman, 566 F.2d 817, 825 (2d Cir.1977) ("Th[e] right to the preservation of family integrity encompasses the reciprocal rights of both parent and children.").  "The state's removal of a child from his or her parent may therefore give rise to a variety of cognizable constitutional claims." Southerland v. City of New York, 680 F.3d 127, 142 (2d Cir. 2012).

As a general rule, "before parents may be deprived of the care, custody, or management of their children without their consent, due process—ordinarily a court proceeding resulting in an order permitting removal—must be accorded to them."  Grullon v. Admin. for Children's Servs., No. 18 CV 3129, 2021 WL 981848, at *5 (S.D.N.Y. Mar. 16, 2021).  This requirement was satisfied in this case, as all custody decisions were preceded by court proceedings.  (See SAC ¶¶ 81, 84-86, 90-91, 111-14.)

While weighty, the right to family integrity does not automatically and invariably "override the sometimes competing government interest in the protection of minor children, [ ] particularly in circumstances where the protection is considered necessary as against the parents

21

Case 1:21-cv-03803-DG-RML    Document 53    Filed 02/21/24    Page 22 of 42 PageID #: 396

themselves." E.D. ex rel. V.D. v. Tuffarelli, 692 F. Supp. 2d 347, 360 (S.D.N.Y. 2010) (quoting Wilkinson ex rel. Wilkinson v. Russell, 182 F.3d 89, 104 (2d Cir. 1999)) (internal quotation marks omitted).  In the child removal context, "because the law contemplates a careful balancing of interests, a parent's substantive constitutional rights are not infringed if a caseworker, in effecting a removal of a child from the parent's home, has a reasonable basis for thinking that a child is abused or neglected."  Southerland, 680 F.3d at 152.  "Where a case worker's action is 'incorrect or ill-advised' or where an investigation is 'faulty,' such deficiencies do not rise to the level of an unconstitutional investigation, provided that the case worker's action is 'consistent with some significant portion of the evidence before [him or her].'"  Orlik v. Dutchess Cnty., 603 F. Supp. 2d 632, 647 (S.D.N.Y. 2009) (citation omitted).

While "[t]he government must conduct a sufficient investigation into the alleged neglect or abuse it relies upon to establish a reasonable basis for its action," Graham v. City of New York, 869 F. Supp. 2d 337, 350 (E.D.N.Y. 2012) (citing Nicholson v. Williams, 203 F. Supp. 2d 153, 251 (E.D.N.Y. 2002)), "mere failure to meet local or professional standards" or "a faulty investigation does not necessarily rise to the level of an unconstitutional investigation." Wilkinson, 182 F.3d at 106 (holding that notwithstanding deficiencies in investigation—subject child's express claims raised significant doubt as to the likelihood of abuse; there was an absence of any medical evidence; investigator interviewed the child only once, using leading questions; investigator sought corroboration from a child psychiatrist who had met with the child only two or three times—caseworkers had a reasonable basis to suspect abuse because the investigation "generated significant information supporting a finding of abuse").

Accordingly, courts find constitutional violations only in "obvious extremes," such as when caseworkers "[ignore] overwhelming exculpatory information or [manufacture]

22

false evidence." Wilkinson, 182 F.3d at 104; see also Estiverne v. Esernio-Jenssen, 833 F. Supp. 2d 356, 373 (E.D.N.Y. 2011) (finding due process violation where plaintiffs were without custody of their three infant children for nearly ten months following a court-ordered removal and defendant doctor "both ignored significant exculpatory evidence and manufactured a false or reckless diagnosis"); Hirsch v. Otsego Cnty. Dep't of Soc. Servs., No. 89 CV 954, 1992 WL 59178, at *4-5 (N.D.N.Y. Mar. 12, 1992) (finding that a reasonable jury could conclude that a caseworker's bias against plaintiff and failure to pursue "credible and believable" leads were "so egregious that it shocked the conscience"). This is a difficult standard to meet, particularly because the Second Circuit has clarified that impairment of the family relationship must have been defendants' *intent*—not merely an "indirect and incidental" consequence of their conduct. Gorman v. Rensselaer Cnty., 910 F.3d 40, 48 (2d Cir. 2018). Where defendants were motivated by other legitimate interests—rather than an intent to deprive the plaintiff of his or her rights to associate with family members—such a claim cannot survive. See, e.g., Oglesby v. Eikszta, No. 07 CV 51, 2011 WL 4442932, at *6 (N.D.N.Y. Sept. 22, 2011).

Like the claim for family integrity, to sustain a substantive due process claim against the state's perceived infringement of valid liberty or property interests, "a plaintiff must demonstrate that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 431 (2d Cir. 2009) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)). "[T]he 'shock the conscience' standard is satisfied where the conduct was 'intended to injure in some way unjustifiable by any government interest,' or in some circumstances if it resulted from deliberate indifference." Rosales-Mireles v. United States, 138 S. Ct. 1897, 1906 (2018) (quoting Lewis, 523 U.S. at 849-50). The Second Circuit has held that "substantive due

process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." Natale v. Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999).

RJC and DJC were removed from their parents' custody and placed in the custody of an aunt for one day and their father was not permitted to live with them for approximately 125 days. (Id. ¶¶ 81, 84-86, 90-91.) Although brief separations and lack of wholesale relinquishment of the right to rear children do not typically give rise to a finding of a constitutional violation, there appears to be a triable issue as to whether defendants had a reasonable basis for their findings of abuse. See, e.g., Nicholson, 344 F.3d at 172 ("there had been no such violation in the case of a temporary custody transfer, in part because it did 'not result in [the] parents' wholesale relinquishment of their right to rear their children.'") (quoting Joyner ex rel. Lowry v. Dumpson, 712 F.2d 770, 778 (2d Cir. 1983)); Oglesby, 2011 WL 4442932, at *6 (brief separations "do[ ] not give rise to the level of egregiousness necessary for a substantive due process violation, where the purpose of the separation was to ensure the physical well-being of the detained individual, which is a legitimate governmental objective").

Plaintiffs allege that "[d]efendants' conduct and actions against the Jean-Charles family ignored overwhelming exculpatory evidence and manufactured false evidence to justify their actions." (SAC ¶ 121.) Specifically, plaintiffs allege that defendants used suggestive and leading questioning to encourage RJC to "make up a facially fanciful story that any reasonably competent investigator would have known was a fabrication" and that there "was no basis for making the abuse report based on how RJC presented himself at school that day." (Id. ¶¶ 41, 45.) Plaintiffs also allege that defendants "utterly failed to conduct any kind of reasonable investigation into the veracity of any of RJC's statements, contrary to established investigative procedures." (Id. ¶ 56.) Moreover, plaintiffs allege that "[d]efendants' conduct was so shocking,

vindictive, egregious and arbitrary that it violated the community's conscience."  (Id. ¶ 122.)

Accepting the allegations in the complaint as true and drawing all reasonable inferences in

plaintiffs' favor, I find that RJC and DJC have stated claims for violations of their rights to

family integrity and due process.  See McCarthy, 482 F.3d at 191.

### iii.   Unlawful Seizure

Plaintiffs allege that RJC and DJC were unlawfully seized by the Success

defendants, defendant Eubanks, and defendant Gonzalez on March 15, 2017, when RJC was

interviewed about his swollen lip at school and again when RJC and DJC were taken to 45

Nevins Street, separated from their parents, and placed in separate interrogation rooms for about

an hour.  (SAC ¶¶ 49, 71-73, 129.)  Defendants argue that plaintiffs fail to establish that they

were unlawfully seized.  (City Mem. at 15.)

"[T]he Fourth Amendment applies in the context of the seizure of a child by a

government agency official during a civil child-abuse or maltreatment investigation."  Phillips v.

Cnty. of Orange, 894 F. Supp. 2d 345, 359-60 (S.D.N.Y. 2012) (quoting McIntyre, 235 F.3d at

762).  The threshold question, therefore, is whether the in-school interview of RJC and

interrogation of RJC and DJC at 45 Nevins Street constituted "seizures" for Fourth Amendment

purposes.  See Kyllo v. United States, 533 U.S. 27, 31 (2001) (noting that "the antecedent

question" in a Fourth Amendment inquiry is whether the governmental conduct in question

constituted a search or seizure).  Only if the actions continued "seizures" does the court then

analyze whether the seizures were reasonable under the Fourth Amendment.  See Illinois v.

Caballes, 543 U.S. 405, 409-10 (2005).

"A 'seizure', triggering the Fourth Amendment's protections occurs . . . when

government actors have, 'by means of physical force or show of authority . . . in some way

restrained the liberty of a citizen.'" Graham, 869 F. Supp. 2d at 354-55 (quoting Graham v.

Connor, 490 U.S. 386, 395 n.10 (1989)); see also Gardiner v. Inc. Vill. of Endicott, 50 F.3d 151,

155 (2d Cir. 1995) (stating that an individual is seized if, under the circumstances presented, "a

reasonable person would have believed he was not free to leave").   "Factors that have been found

relevant in determining whether a seizure has occurred include: 'threatening presence of several

officers; the display of a weapon; physical touching of the person [by] the officer; language or

tone indicating that compliance with [the] officer was compulsory; prolonged retention of a

person's personal effects, such as airplane tickets or identification; and a request by an officer to

accompany him to the police station or a police room.'"   Dejesus v. Vill. of Pelham Manor, 282

F. Supp. 2d 162, 169 (S.D.N.Y. 2003) (quoting United States v. Lee, 916 F.2d 814, 819 (2d Cir.

1990)).   Courts should also consider the age of the person being questioned because "whether the

person being questioned is a child or an adult" is "relevant" to whether a person would feel free

to leave.   Phillips, 894 F. Supp. 2d at 360 (quoting United States v. Little, 18 F.3d 1499, 1505 n.6

(10th Cir. 1994)).

    Several circuits have held that an in-school interview of a child for the purpose of

investigating the student's conduct constitutes a seizure under the Fourth Amendment.   Phillips,

894 F. Supp. 2d at 362 (collecting cases).   Moreover, "there are numerous other lower courts

which have held or assumed that an in-school interview of a child to investigate allegations of

parental abuse can constitute a seizure under the Fourth Amendment."   Id. (collecting cases).

Examining the circumstances surrounding the in-school interview of RJC and the interrogations

of RJC and DJC at 45 Nevins Street, plaintiffs have alleged sufficient facts to state a plausible

claim that RJC and DJC were seized.   During these events, RJC was seven years old and DJC

was three years old.   (SAC ¶¶ 13, 14.)   RJC was interviewed at his school by defendants Eubanks

26

and Gonzalez and no attempt was made to contact RJC's parents until after defendant Gonzalez

concluded his interview with RJC.  (Id. ¶¶ 44, 49, 59.)  When RJC's parents arrived at the

school, they were not permitted to speak with RJC, who was being detained in a separate room

by defendant Eubanks and other Success Academy personnel.  (Id. ¶ 60.)  Then, as mentioned

above, both children were separated from their parents and taken into separate interrogation

rooms for an hour at 45 Nevins Street.  (Id. ¶¶ 71, 72.)  Therefore, I find that plaintiffs have pled

facts sufficient at this stage in the proceedings to find that no reasonable seven- or three-year-old

would feel free to leave or decline the adults' questioning and that plaintiffs have stated a claim

that RJC and DJC were seized.

Having made the threshold determination that the in-school interview and

interrogations at 45 Nevins Street were seizures, the court next examines whether plaintiffs have

adequately alleged that the seizures were unreasonable, and thus in violation of the Fourth

Amendment.  Similar to the standard governing substantive due process analysis, the Fourth

Amendment analysis "requires the Court to determine whether the defendants' actions were

'objectively reasonable' in light of the facts and circumstances confronting them."  Kia P., 2 F.

Supp. 2d at 292 (quoting Connor, 490 U.S. at 397).  As a general rule, absent exigent

circumstances or "special needs," seizures are unreasonable unless they are supported by

probable cause and a warrant or equivalent court order.  Guan N. v. NYC Dep't of Educ., No. 11

CV 4299, 2014 WL 1275487, at *21 (S.D.N.Y. Mar. 24, 2014) (citing Tenenbaum v. Williams,

193 F.3d 581, 602-03 (2d Cir. 1999)).  To establish that a seizure was unreasonable a child may

(1) "assert that the act of seizure itself lacked a lawful basis, such as consent, probable cause, or

exigent circumstances[,]" (2) "assert that the seizure was carried out in an unreasonable manner,

such as through the use of excessive force or through a sudden, surprise raid[,]" or (3) "assert

that the seizure endured for an unreasonable length, and thereby burdened the child's interest in being in the care and custody of his or her parents." Southerland, 680 F.3d at 156 n.25 (collecting cases).

As discussed above, plaintiffs allege that "[d]efendants' conduct and actions against the Jean-Charles family ignored overwhelming exculpatory evidence and manufactured false evidence to justify their actions." (SAC ¶ 121.) Plaintiffs also allege that defendants "utterly failed to conduct any kind of reasonable investigation into the veracity of any of RJC's statements, contrary to established investigative procedures." (Id. ¶ 56.) Finally, plaintiffs specifically allege that they were held and interrogated against their will without probable cause or justification. (Id. ¶ 129.) At this stage, plaintiffs' allegations are deemed as true and all reasonable inferences must be drawn in their favor. As plaintiffs argue, "the Children state claims for unlawful seizure, and the question of whether the defendants had reasonable or probable cause or whether they acted in bad faith or intentionally reported false evidence should be tested in discovery, not resolved on a motion to dismiss." (Pls.' City Opp. at 25; Pls.' Success Opp. at 25.) Accordingly, I find that RJC and DJC have stated a claim for unlawful seizure.[9]

### iv.  Right to Counsel

Plaintiffs allege that defendants Mirabella and Eubanks violated RJC's Fifth and Sixth Amendment rights to counsel and to be silent "when Mirabella went to RJC's school without consent and knowing that RJC had assigned counsel and coerced, with the assistance of Eubanks, a signed statement by RJC implicating his father in a crime." (SAC ¶ 133.) The City defendants argue that plaintiffs have failed to allege that they were owed Miranda warnings, that

---

[9] "§ 1983 allow[s] a plaintiff to seek money damages from government officials who have violated his [or her] Fourth Amendment rights." Wilson v. Layne, 526 U.S. 603, 609 (1999).

§ 1983 is not the proper remedy for a failure to give <u>Miranda</u> warnings, and that the right to counsel did not attach because adversarial judicial proceedings were not initiated against them. (City Mem. at 18-19.)  The Success defendants contend that plaintiffs do not allege a single fact relating to them in connection with this claim.  (Success Mem. at 10-11.)  Plaintiffs note that they are "not complaining about the admissibility of any statements obtained in violation of their rights; instead, they are seeking[] damages and vindication of their rights, which is precisely the purpose of Section 1983."  (Pls.' City Opp. at 33-34; Pls.' Success Opp. at 33-34.)

"The Fifth Amendment protects against the admissibility of incriminating statements obtained during custodial interrogation of a person who has not properly waived his right to counsel." <u>Nesbitt v. Cnty. of Nassau</u>, No. 05 CV 5513, 2006 WL 3511377, at *2 n.7 (E.D.N.Y. Dec. 6, 2006) (citation omitted).  "The remedy for a violation of this right is exclusion of any self-incriminating statements from use at a criminal proceeding, and not an action for damages under Section 1983." <u>Myers v. Cnty. of Nassau</u>, 825 F. Supp. 2d 359, 367 (E.D.N.Y. 2011) (collecting cases); <u>see also</u> <u>Vega v. Tekoh</u>, 597 U.S. 134, 150 (2022) ("violation of <u>Miranda</u> does not necessarily constitute a violation of the Constitution, and therefore such a violation does not constitute "the deprivation of [a] right . . . secured by the Constitution.").  Therefore, even if plaintiffs had stated a claim for violation of the Fifth Amendment, I find that the complaint fails to state a claim pursuant to § 1983 upon which relief can be granted and recommend that the claim be dismissed as it pertains to the Fifth Amendment.

The Sixth Amendment right to assistance of counsel is triggered when criminal proceedings have commenced, "'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" <u>United States v. Gouveia</u>, 467 U.S. 180, 187-88 (1984) (quoting <u>Kirby v. Illinois</u>, 406 U.S. 682, 688-89 (1972)).  Courts in this circuit look to

29

New York law to determine whether such proceedings had commenced against a plaintiff at or prior to the time of the offending conduct.  See Moore v. Illinois, 434 U.S. 220, 228 (1977); see also Meadows v. Kuhlmann, 812 F.2d 72, 76-77 (2d Cir. 1987), cert. denied, 482 U.S. 915 (1987).  In New York, "a criminal proceeding, and with it the right to counsel, is initiated by the filing of an accusatory instrument."  Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 349 (2d Cir. 1998) (citing People v. Blake, 35 N.Y.2d 331, 339 (1974)); see also N.Y. CRIM. PRO. L. § 100.05 ("A criminal action is commenced by the filing of an accusatory instrument with a criminal court . . . .").  Criminal proceedings were never commenced against RJC.  Therefore, plaintiffs have failed to state a claim upon which relief can be granted and I recommend that this claim be dismissed as it pertains to the Sixth Amendment.

b.  Race Discrimination

Plaintiffs allege that defendants violated their rights under § 1983 and the Equal Protection Clause by "purposefully and intentionally employ[ing] racist stereotypes about persons of color, actual or perceive[d] poverty and the existence of abuse and neglect of children and [taking the alleged actions] against the Jean-Charles family."  (SAC ¶ 142.)[10]  The constitutional right at issue here is afforded by the Equal Protection Clause, which provides that

---

[10] The allegations related to this claim do not involve the Success defendants, and plaintiffs do not refute the Success defendants' assertion that plaintiffs have abandoned the claim of race discrimination as against the Success defendants.  (See SAC ¶¶ 141-50; Pls.' City Opp. at 29-30; Pls.' Success Opp. at 29-30; Reply Memorandum of Law in Further Support of Motion by Defendants Success Academy Charter Schools, Inc., Success Academy Charter Schools – NYC, and Vailarie Eubanks to Dismiss the Complaint, dated June 16, 2023, Dkt. No. 50, at 3.)  I therefore recommend that it be dismissed as to the Success defendants.  See, e.g., Bonilla v. Smithfield Assoc. LLC, No. 09 CV 1549, 2009 WL 4457304 at *4 (S.D.N.Y. Dec. 4, 2009) (dismissing plaintiff's claims as abandoned by failing to address them in his opposition motion to defendant's motion to dismiss all claims); Thomas v. Atl. Express Corp., No. 07 CV 1978, 2009 WL 856993, at *2 (S.D.N.Y. Mar. 31, 2009) ("[Defendant] has moved to dismiss [plaintiff's] due process and breach of contract claims.  In his opposition, [plaintiff] failed to respond to [defendant]'s argument that his due process claim should be dismissed, and therefore that claim is deemed abandoned.").

no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S.

Const. Amend. XIV, § 1.  The "central purpose" of the Equal Protection Clause is "the

prevention of official conduct discriminating on the basis of race," the very misconduct alleged

in this case.  Washington v. Davis, 426 U.S. 229, 239 (1976).  To prevail on a § 1983 claim of

race discrimination in violation of equal protection, the law requires a plaintiff to prove the

defendant's underlying "racially discriminatory intent or purpose."  DiStiso v. Cook, 691 F.3d

226, 240 (2d Cir. 2012) (quoting Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S.

252, 265 (1977)).  Similarly, to state a race-based claim under the Equal Protection Clause, a

plaintiff must allege that a government actor intentionally discriminated against him or her on the

basis of his or her race.  Brown v. City of Oneonta, New York, 221 F.3d 329, 337 (2d Cir. 2000)

(citing Hayden v. Cnty. of Nassau, 180 F.3d 42, 48 (2d Cir. 1999)).

There are several ways for a plaintiff to plead intentional discrimination.  A

plaintiff could point to a law or policy that "expressly classifies persons on the basis of race."  Id.

(citations omitted).  Or, a plaintiff could identify a facially neutral law or policy that has been

applied in an intentionally discriminatory manner.  Id. (citing Yick Wo v. Hopkins, 118 U.S.

356, 373-74 (1886)).  A plaintiff could also allege that a facially neutral statute or policy has an

adverse effect and that it was motivated by discriminatory animus.  Id. (citations omitted).

Here, as previously discussed, plaintiffs allege that

injuries to Plaintiffs were the direct and proximate result of de
facto City policies and practices in existence at the time of the
actions, which included, among other things: (a) long-standing and
intentional practice of racism within the ranks of ACS; (b) City
and ACS policymakers, who are predominately white, condoning,
encouraging, and acquiescing in a longstanding and widespread
practice among ACS personnel of targeting persons of color; (c)
deliberate indifference and willful blindness by ACS and his
executive staff to the fact that caseworkers were regularly

31

employing racist stereotypes in the investigation and prosecution
of allegations of abuse and neglect.

(SAC ¶ 149.)  Plaintiffs additionally allege that "the City has a pattern and practice of employing

racist stereotypes in the way that ACS acts toward Blacks[,]" and that "Gonzalez employed those

racist stereotypes in connection with his conduct directed toward the Jean-Charles family."

(Pls.' City Opp. at 38; see also SAC ¶¶ 58, 66-70.)  Furthermore, plaintiffs allege that the City of

New York and ACS's senior policymakers knew that officers and agents of ACS acted based on

stereotyping of people of color, failed to take adequate steps to discipline its members who

engaged in discriminatory conduct against persons of color, and as a result, the City is liable to

plaintiffs for creating, fostering, and maintaining an "anything goes" policy and practice in terms

of unfairly targeting persons of color.  (SAC ¶¶ 145-47.)  As noted by the Supreme Court, "the

Constitution prohibits selective enforcement of the law based on considerations such as race."

Whren v. United States, 517 U.S. 806, 813 (1996).  Accordingly, I find that plaintiffs have stated

a claim for race discrimination against the City defendants and recommend that the City

defendants' motion to dismiss this claim be denied.

      c.   Disability Discrimination

      Plaintiffs' claim for disability discrimination under Section 504 of the

Rehabilitation Act, the ADA, and the NYCHRL is asserted only against the Success defendants

and only pertains to RJC.  (See SAC ¶¶ 162-63.)  Under Title II of the ADA and Section 504 of

the Rehabilitation Act, "no qualified individual with a disability shall, by reason of such

disability, be excluded from participation in or be denied the benefits of the services, programs,

or activities of a public entity, or be subjected to discrimination by any such entity."  Patrick v.

Success Acad. Charter Sch., Inc., 354 F. Supp. 3d 185, 225-26 (E.D.N.Y. 2018) (citing 42 U.S.C.

§ 12132; 29 U.S.C. § 794).

"Claims under Title II of the ADA and Section 504 of the Rehabilitation Act are analyzed identically." Eskenazi-McGibney v. Connetquot Cent. Sch. Dist., 84 F. Supp. 3d 221, 231 (E.D.N.Y. 2015) (citing Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003)). However, under the Rehabilitation Act, a defendant must have discriminated against the plaintiff "solely" because of the plaintiff's disability, whereas under the ADA, it is enough if the plaintiff's disability was a motivating factor in the discrimination. Spychalsky v. Sullivan, No. 01 CV 958, 2003 WL 22071602, at *6 (E.D.N.Y. Aug. 29, 2003), aff'd, 96 F. App'x 790 (2d Cir. 2004) (citations omitted). "To state a *prima facie* discrimination claim under either the ADA or the Rehabilitation Act, . . . [a plaintiff] must allege: (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability." Patrick, 354 F. Supp. at 226 (internal quotation marks and citations omitted).

"[A] disabled individual is one who: '(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.'" Falso v. Ablest Staffing Servs., 533 F. Supp. 2d 332, 336 (W.D.N.Y. 2008), aff'd, 328 F. App'x 54 (2d Cir. 2009) (citing 42 U.S.C. § 12102(2)). Plaintiffs allege that the "School Defendants are jointly and severally liable to the Plaintiffs on the ground that they intentionally discriminated against RJC on the grounds that he was perceived to have a learning disability that substantially limited his ability to learn and to read and was disabled with the meaning of Section 504 of the Rehabilitation Act, . . . the Americans With Disability Act, . . . and . . . the New York City Administrative Code[.]" (SAC ¶ 163.) Thus, plaintiffs have alleged that RJC is a qualified individual under the ADA and

33

Rehabilitation Act.  See Lawton, 323 F. Supp. 3d at 365 ("plaintiffs are only required to allege, rather than prove, that defendants regarded them as disabled.").  Plaintiffs have also alleged, and the Success defendants do not dispute, that Success Academy entities are recipients of funding from federal, state, and local government sources.  (Id. ¶ 162.)  Therefore, they are subject to the Rehabilitation Act and the ADA.  See Lawton, 323 F. Supp. 3d at 363 ("A prima facie violation of Section 504 requires proof from the plaintiff that . . . the program or special service receives federal funding.").

The Success defendants argue that plaintiffs' disability discrimination claim must be dismissed because the facts alleged are insufficient to show disability discrimination.  (Success Mem. at 20.)  Among the facts alleged to support this claim are that (1) Success Academy informed Mr. and Mrs. Jean-Charles it believed RJC had learning disabilities and requested that Mr. and Mrs. Jean-Charles consent to having him evaluated for the purpose of classifying him as having a learning disability, (2) Mr. and Mrs. Jean-Charles did not consent to the evaluation, and (3) as a result of the parents' refusal, the school began a sustained campaign of harassment to push RJC out of the school.  (Id. ¶¶ 25-29.)  Plaintiffs then allege multiple facts related to the school's campaign of harassment against the Jean-Charles family and that Success Academy has an established policy and practice of pushing out of the school children who are perceived as having learning disabilities.  Therefore, plaintiffs have alleged that RJC was discriminated against by the Success defendants because of his disability, and I find that RJC has stated a claim for disability discrimination under the ADA and Rehabilitation Act.  Lawton, 323 F. Supp. 3d at 365 (Success Academy students placed on a "got to go list" by the school stated a claim for disability discrimination based on a perceived disability); S.G., 2019 WL 1284280 at

*14-17 (discrimination claims properly stated based on discriminatory treatment of a student with a perceived learning disability).

Under the NYCHRL, providers of public accommodations may not, "[b]ecause of any person's . . . disability, . . . refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation." N.Y. CITY ADMIN. CODE § 8-107(4)(1)(a). The NYCHRL is "construed liberally for the accomplishment of [its] uniquely broad and remedial purposes thereof." Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transp. Auth., 11 F.4th 55, 68 (2d Cir. 2021) (citations omitted). "[F]ederal civil rights statutes can serve only as a floor below which the [NYCHRL] cannot fall." Id. (alteration in original) (quoting Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013)). Accordingly, "courts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing [the NYCHRL's] provisions broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible." Id. (quoting Mihalik, 715 F.3d at 109). Since I have found that RJC has adequately pled a claim under the narrower federal standards, I find that he has also done so under the broader NYCHRL.

**V.    Immunity**

Defendants assert that defendants Connolly and Mirabella are entitled to absolute immunity or qualified immunity in the alternative, that defendant Gonzalez is entitled to qualified immunity, and that defendant Eubanks is entitled to qualified and statutory immunity[11]

---

[11] "Social Services Law § 419 affords immunity to those who participate in the investigation of or make a report of suspected child abuse or maltreatment, provided they act within the scope of their employment and do not engage in willful misconduct or gross negligence." Lentini v. Page, 5 A.D.3d 914, 915 (3d Dep't 2004); see also Kleinbart v. New York City, No. 21 CV 2169, 2022 WL 16754555, at *8 (E.D.N.Y. June 8, 2022) (noting that doctor who reported abuse was
(Continued . . .)

and that all claims against them should be dismissed.  (City Mem. at 5-6, 23; Success Mem. at 23.)  Plaintiffs argue broadly that no defendant is entitled to immunity of any kind and argue more specifically that defendants Connolly and Mirabella are not entitled to prosecutorial immunity because their actions were investigative rather than prosecutorial.  (Pls.' City Opp. at 35-36.)

      a.   Absolute Immunity

"Prosecutors enjoy absolute immunity from liability under § 1983 in suits seeking damages for acts carried out in their prosecutorial capacities."  McFadden v. New York, No. 10 CV 141, 2010 WL 628924, at *2 (E.D.N.Y. Feb. 22, 2010) (citing Imbler v. Pachtman, 424 U.S. 409, 430 (1976)).  Prosecutors' absolute immunity extends to non-prosecutors "performing 'functions analogous to those of a prosecutor.'"  Cornejo v. Bell, 592 F.3d 121 (2d Cir. 2010) (quoting Butz v. Economou, 438 U.S. 478, 515 (1978)).  "The immunity covers virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate."  Anilao v. Spota, 27 F.4th 855, 863-64 (2d Cir. 2022), cert. denied sub nom. Anilao v. Spota, III, 143 S. Ct. 1781 (2023) (internal quotation marks and citations omitted).  "However, a prosecutor does not enjoy absolute immunity for 'those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate.'"  Opoku v. Cnty. of Suffolk, 123 F. Supp. 3d 404, 416 (E.D.N.Y. 2015) (quoting Imbler, 424 U.S. at 430-31).  "Thus, unless a prosecutor proceeds in the clear absence of all jurisdiction, absolute immunity [from § 1983 liability] exists for those prosecutorial activities intimately associated with the judicial phase of the criminal process."  Anilao, 27 F.4th at 864 (quoting Barr v. Abrams, 810 F.2d 358,

---

immune under § 419), report and recommendation adopted in part, 2022 WL 4597437 (E.D.N.Y. Sept. 30, 2022) (not addressing immunity).  I have recommended that plaintiffs' negligence claim be dismissed, so I will not discuss whether defendant Eubanks is entitled to statutory immunity for her actions related to reporting the suspected abuse of RJC.

361 (2d Cir. 1987)).  "Conversely, where a prosecutor acts without any colorable claim of authority, he loses the absolute immunity he would otherwise enjoy" and is left with only qualified immunity as a potential shield.  Barr, 810 F.2d at 361.

Plaintiffs argue that defendants Connolly and Mirabella[12] are not entitled to prosecutorial immunity because the actions they took were investigative, which would only entitle them to qualified immunity.  (Pls.' City Opp. at 35.)  Specifically, plaintiffs assert that their actions in obtaining or seeking to obtain unlawfully incriminating statements from the Jean-Charles family were investigative rather than prosecutorial.  (Id.)  Defendant Connolly represented ACS in Family Court and the facts alleged against him are as follows: (1) defendant Connolly helped defendant Gonzalez prepare and file an emergency Neglect Petition in New York City Family Court, which plaintiffs allege contained several material misstatements of fact and omissions of material facts regarding the alleged abuse of RJC; (2) the ACS caseworker who replaced defendant Gonzalez, Oasia Davis-Walker, informed Mr. Jean-Charles that defendant Connolly was "out to get [him]" and that defendant Connolly told the new caseworker to try to get Mr. Jean-Charles to admit that he physically abused his son and that if he did acknowledge his wrongdoing that the outstanding neglect matters could be resolved amicably; and (3) that the new ACS caseworker told Mr. Jean-Charles that it was improper office procedure for Connolly to use a caseworker to extract admissions against a respondent in a pending Family Court matter. (See SAC ¶¶ 79-80, 100-02.)

---

[12] The only facts alleged as to defendant Mirabella are that (1) he requested to be permitted to interview RJC privately in June 2017, and (2) against the wishes of Mrs. Jean-Charles, he went to RJC's school and interrogated RJC about the abuse allegations and obtained a "supporting deposition" signed by RJC on or about June 9, 2017.  (See SAC ¶¶ 104-09.)  Although these actions appear investigative, I have recommended that plaintiffs' claim for violation of the right to counsel stemming from these facts be dismissed as to all defendants.  Therefore, I will not address defendant Mirabella's potential immunity as the issue is moot.

"The Second Circuit Court of Appeals has explicitly held . . . that ACS attorneys . . . are entitled to prosecutorial immunity because they perform functions analogous to those of a prosecutor by initiat[ing] and prosecut[ing] child protective orders and represent[ing] the interests of the Department and the County in Family Court." Golian v. New York City Admin. for Child. Servs., 282 F. Supp. 3d 718, 726 (S.D.N.Y. 2017) (internal quotation marks and citations omitted). Here, although defendant Connolly is alleged to have violated ACS office procedure and the Neglect Petition may have contained errors, it does not appear that he acted outside the bounds of his jurisdiction as a non-prosecutor performing "functions analogous to those of a prosecutor." Id. Filing a neglect petition falls squarely within the role of an ACS attorney as advocate for the interests of the Department. Furthermore, I have recommended that claims pertaining to Mr. Jean-Charles be dismissed, so any argument that defendant Connolly's attempt to obtain information from the new ACS caseworker constituted investigative rather than advocative work is moot. Accordingly, I find that defendant Connolly is entitled to absolute immunity for his involvement in filing the Neglect Petition.[13]

      b. Qualified Immunity

"Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015). It applies unless (1) the plaintiff sufficiently pleaded a constitutional violation and (2) the law the official allegedly violated was clearly established and apparent to a reasonable official at the time of the alleged conduct. Nat'l Rifle Ass'n of Am. v. Vullo, 49 F.4th 700, 714 (2d Cir. 2022), cert. granted in

---

[13] I will therefore not address whether defendant Connolly is entitled to qualified immunity.

part, No. 22 CV 842, 2023 WL 7266997 (U.S. Nov. 3, 2023) (citing Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)).  Defendants bear the burden of establishing qualified immunity.  Vincent v. Yelich, 718 F.3d 157, 166 (2d Cir. 2013).  Because qualified immunity protects officials not merely from liability but from litigation, the issue should be resolved when possible on a motion to dismiss, "before the commencement of discovery," to avoid subjecting public officials to time consuming and expensive discovery procedures.  Garcia, 779 F.3d at 97 (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).

"Yet when a defendant raises a defense of qualified immunity at the initial pleadings stage, a court must take care not to engage in a premature determination of the facts in a manner at odds with those facts that the plaintiff has pleaded in the complaint." Wang v. Delphin-Rittmon, No. 17 CV 586, 2023 WL 2624351, at *9 (D. Conn. Mar. 24, 2023).  The defendant presenting an immunity defense on a motion to dismiss "must therefore show not only that the facts supporting the defense appear on the face of the complaint, but also that it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." Horn v. Stephenson, 11 F.4th 163, 170 (2d Cir. 2021).

As discussed above, I have found that plaintiffs have adequately pled constitutional violations in their first, second, third, and sixth claims.  Those claims, for family integrity, due process, unlawful seizure, and race discrimination are made pursuant to clearly established law under § 1983 and the Equal Protection Clause.  Accordingly, I find that defendants Gonzalez and Eubanks are not entitled to qualified immunity related to claims one through three and that defendant Gonzalez is not entitled to qualified immunity related to the sixth claim at this stage in the proceedings.[14]

---

[14] I have recommended that plaintiffs' sixth claim be dismissed as to the Success defendants, including defendant Eubanks.

As to plaintiffs' ninth claim, although "the right not to be subjected to disability discrimination has long been clearly established[,]" <u>Lawton</u>, 323 F. Supp. 3d at 368 (citation omitted), there is no individual liability under either Section 504 of the Rehabilitation Act or Title II of the ADA.  <u>See, e.g.</u>, <u>Moskowitz v. Great Neck Union Free Sch. Dist.</u>, No. 20 CV 1659, 2021 WL 4268138, at *10 (E.D.N.Y. Aug. 4, 2021), <u>report and recommendation adopted</u>, 2021 WL 3878777 (E.D.N.Y. Aug. 31, 2021); <u>Piotrowski on behalf of J.P. v. Rocky Point Union Free Sch. Dist.</u>, 462 F. Supp. 3d 270, 285 (E.D.N.Y. 2020); <u>see also</u> <u>Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn</u>, 280 F.3d 98, 107 (2d Cir. 2001).  However, "[i]ndividual employees may be held liable under NYCHRL if they actually participated in the conduct giving rise to the discrimination claim."  <u>Dillon v. Ned Mgmt., Inc.</u>, 85 F. Supp. 3d 639, 658 (E.D.N.Y. 2015); <u>see also</u> <u>Milord-Francois v. New York State Off. of Medicaid Inspector Gen.</u>, 635 F. Supp. 3d 308, 328 (S.D.N.Y. 2022) ("the NYCHRL imposes personal liability on employees for their own discriminatory conduct.").  Plaintiffs allege that defendant Eubanks was involved in the campaign of harassment against the Jean-Charles family.  (<u>See</u> SAC ¶ 27.)  Accordingly, I recommend that plaintiffs' ninth claim, for disability discrimination, be dismissed against defendant Eubanks only under Section 504 of the Rehabilitation Act and the ADA, but that the claim against her under the NYCHRL not be dismissed at this stage in the proceedings.

## VI.  Requests to Amend the Complaint

To the extent that plaintiffs' claims have not been properly stated, plaintiffs request leave to amend the Second Amended Complaint.  (<u>See</u> City Opp. at 8, 39; Success Opp. at 8, 39.)  Under Rule 15(a)(1) of the Federal Rules of Civil Procedure, a "party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or

21 days after service of a motion under 12(b), (e), or (f), whichever is earlier." FED. R. CIV. P. 15(a)(1). When a party cannot amend its pleading as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). However, "motions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)). "An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." Silver v. City of New York, No. 17 CV 7565, 2020 WL 4461946, at *2 (E.D.N.Y. Apr. 21, 2020), report and recommendation adopted, 2020 WL 4431563 (E.D.N.Y. July 31, 2020) (citations omitted).

I have recommended that claims one and two be dismissed against defendants City of New York, Success Academy Charter School Inc., and Success Academy Charter School – NYC for failure to allege Monell liability. Plaintiffs specifically request leave to add allegations that the City defendants violated plaintiffs' right to be free from unlawful seizures and their rights to due process under the New York State Constitution because Monell does not apply to those parallel claims. (Pls.' City Opp. at 39); see also Herrera v. Shea, No. 20 CV 3665, 2020 WL 7711856, at *10 (E.D.N.Y. Dec. 29, 2020) ("Whereas a Section 1983 claim under Monell may not be premised on a theory of respondeat superior . . . a similar claim under Article I, § 12 of the New York State Constitution may be[.] Accordingly, several courts have allowed New York state constitutional claims under a theory of respondeat superior to proceed on the ground that a Monell claim 'is not an adequate alternative remedy.'") (citations omitted). Apart

from <u>Monell</u> liability, I have found that plaintiffs have stated claims for unlawful seizure and due process. Therefore, I recommend that plaintiffs be granted leave to add allegations under the New York Constitution pertaining to their rights to be free from unlawful seizure and to due process.

Additionally, I have recommended that plaintiffs' fourth claim, for the right to counsel, be dismissed for failure to state a claim. Amending this claim would be futile because, for the reasons discussed above, it cannot not withstand a motion to dismiss pursuant to Rule 12(b)(6).

CONCLUSION

For the reasons explained above, I respectfully recommend that defendants' motions to dismiss be granted in part and denied in part. Specifically, I recommend that defendants' motions to dismiss claims four, five, seven, eight, ten, eleven, and twelve be granted. I further recommend that defendants' motions to dismiss plaintiffs' first, second, and third claims against all defendants, sixth claim against the City defendants, and ninth claim against the Success defendants as they each pertain to RJC and DJC be denied, but granted as they pertain to Mr. and Mrs. Jean-Charles. Any objection to this report and recommendation must be filed with the Clerk of the Court within fourteen (14) days. Failure to file objections within the specified time period waives the right to appeal the district court's order. <u>See</u> 28 U.S.C. § 636(b)(1); <u>see also</u> FED. R. CIV. P. 72(b), 6(a), 6(d).

Respectfully submitted,

_____/s/_____

ROBERT M. LEVY
United States Magistrate Judge

Dated: Brooklyn, New York
February 21, 2024

42
