UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
HUGHE JEAN-CHARLES, and AUDREY
JEAN-CHARLES on behalf of themselves and
on behalf of their infant children, RJC and DJC,     21-CV-03803-DG-RML

                    Plaintiffs

          -against-               THIRD AMENDED
                                     COMPLAINT WITH JURY
                                     TRIAL DEMAND

THE CITY OF NEW YORK, ADRIAN
GONZALES, DELANO CONNOLLY,
CHRISTOPHER MIRABELLA, SUCCESS
ACADEMY CHARTER SCHOOL, INC.,
SUCCESS ACADEMY CHARTER
SCHOOL –NYC, AND VALERIE EUBANKS,

                    Defendants
----------------------------------------------------------X

       Plaintiffs, by their undersigned attorney, hereby allege and show as and for

their Third Amended Complaint[1] the following:

---

[1] On October 16, 2024, the Court adopted by Order entered on the docket the Report and
Recommendation ("Report") of Magistrate Judge Levy (ECF Doc. # 53), which recommended
granting in part and denying in part Defendants' motions to dismiss Plaintiffs' claims. As a result
of the Order and the Report, the claims of Mr. and Mrs. Jean-Charles are dismissed on
limitations grounds but the claims of the infant children, Plaintiffs RJC and DJC, are not barred
on limitation grounds. In addition, pursuant to the Order and the Report, several of RJC's and/or
DJC's claims in the Second Amended Complaint were dismissed. The Plaintiffs acknowledge
that certain of their claims, therefore, have been dismissed by the Court but nevertheless have not
removed those claims from this pleading because there are decisions in this Circuit holding that
an amended pleading supersedes all prior pleadings and that a plaintiff who drops claims in an
amended pleading waives those claims for purposes of further review. *See, e.g.,Arce v. Walker*,
139 F.3d 329, 332 n.4 (2d Cir. 1998) ("It is well established that an amended complaint
ordinarily supersedes the original and renders it of no legal effect.").

**INTRODUCTION**

1.     This action is brought by Hughe Jean-Charles and Audrey Jean-Charles ("Mr. and Mrs. Jean-Charles") on behalf of themselves and on behalf of their infant children, who are identified as "RJC" and "DJC," to address violations of their individual and collective rights pursuant to 42 U. S. C. § 1983, the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution, Article One, Sections Six, Eleven, and Twelve of the New York State Constitution, and the statutes and laws of the State of New York.

2.     The claims asserted in this action arose initially from false, inflammatory, and discriminatory statements by Defendants Success Academy Charter Schools-NYC, Success Academy Charter School, Inc. (the "Success Academy entities"), and Acting Principal Valerie Eubanks (collectively the "School Defendants") to officers and agents of the State of New York and to officers and agents of the City of New York to the effect that Mr. Jean-Charles "stomped" on the mouth of his seven-year-old son, RJC; that Mr. Jean-Charles "punched" RJC in the stomach with his fist; that Mr. Jean-Charles "whipped" RJC with a belt at least six times, and that Mrs. Audrey Jean-Charles knew about this alleged physical abuse and did nothing about it other than allegedly telling her husband that "he [Mr. Jean-Charles] cannot engage in these actions anymore."

3.     None of these statements by the School Defendants about abuse by

Mr. Jean-Charles or neglect by Mrs. Jean-Charles had any basis in fact, and there was no credible evidence to suggest even the possibility that those facts might have existed. None of the statements were based on personal knowledge, and the objective facts demonstrated that the abuse allegations were based on coached distortions, exaggerations, and fabrications of a small and intimidated seven-year-old child.

4. Nevertheless, as a result of the School Defendants' determination to report allegations of child abuse, officers and agents of the City of New York arrested Mr. Jean-Charles; officers and agents of the Kings County District Attorney, including Defendant Christopher Mirabella, maliciously and in bad faith prosecuted Mr. Jean-Charles for assault, harassment and endangering the welfare of a child; and officers and agents of the New York City Administration for Children's Services, including Defendant Adrian Gonzales and Defendant Delano Connolly (all collectively the "City Defendants"), violate the Plaintiffs' rights to be a family unit when they unlawfully seized RJC, who was seven at the time, and DJC, who was three at the time, separated them from their parents, and in bad faith maliciously prepared, filed and maliciously prosecuted frivolous claims of neglect in New York City's Family Court against both Mr. and Mrs. Jean-Charles.

5. As set forth in greater detail below, the School Defendants and the

City Defendants ignored overwhelming exculpatory information and manufactured false evidence against the Jean-Charles family.

6. Although all criminal and family court proceedings were dismissed, the damage to the Jean-Charles family remains. As a result, the Defendants in this action are liable to the Plaintiffs for the damages they caused the Jean-Charles family in an amount to be determined by a jury at trial.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction because the federal claims arise under 42 U. S. C. § 1983 & §12101 *et seq.,* & § 12132, and 29 U. S. C. § 794a.

8. This Court has supplemental jurisdiction pursuant to 28 U. S. C. § 1367 over the New York Constitutional law claims, the common law and New York City Human Rights Law claims because the facts that form the basis of the state claims and the local law claims arise from the same common nucleus of facts that form the basis for the federal claims.

9. Venue is proper pursuant to 28 U. S. C. § 1391(b) because the events and actions that form the basis of the claims occurred in the Eastern District of New York.

## PARTIES

10. Hughe Jean-Charles is a Black man who was forty-three years old at

the time of the events relevant to this action.

11.     As of March 2017, Mr. Jean-Charles lived with his wife, Audrey Jean-Charles, who is a Black woman, and their two children, RJC and DJC, who were seven and three years old, respectively.

12.     The family lived in their own two-story private house in the Flatlands area of Brooklyn, New York.

13.     Mr. Jean-Charles, who holds a Ph.D. in Kinesiology and a doctoral degree in Physical Therapy, operated at the relevant times on a full-time basis his own physical therapy business, which focused on providing physical, occupational, speech, and geriatric therapy for children and seniors.  Among other things, Mr. Jean-Charles worked as the Director of Rehabilitation Services for Movement Matters Rehabilitation.

14.     Mrs. Jean-Charles, who holds a Master's Degree in Computer Science, worked at the relevant times full-time as an Executive Administrative Assistant for a Dean at New York University.

15.     As of March 2017, RJC was a seven-year-old boy in the second grade at Success Academy Charter School-Bergen Beach, which is located in the Bergen Beach section of Brooklyn.

16.     As of March 2017, DJC was a three-year-old boy who attended ECO for Kids, a nearby pre-school children care facility in Brooklyn.

17.     Success Academy Charter School-Bergen Beach is and was at the relevant times a charter school located in Bergen Beach, Brooklyn and a department or unincorporated section of Defendant Success Academy Charter School, Inc. and Success Academy Charter Schools-NYC.

18.     Defendant Success Academy Charter School, Inc., is a non-profit corporation organized under the laws of the State of Delaware.  It manages and oversees a large network of charter schools throughout the City of New York and provides management, fundraising and other administrative support to Defendant Success Academy Charter Schools-NYC.

19.     Defendant Success Academy Charter Schools-NYC is a not-for-profit educational corporation organized under the laws of the State of New York with its headquarters and principal place of business at 95 Pine Street, New York, New York. It is the governing legal entity for the Success Academy network of schools in New York City, including Success Academy Charter School-Bergen Beach.

20.     Defendant Success Academy Charter School, Inc. and Success Academy Charter Schools-NYC (collectively the "Success Academy" entities) receive federal, state, and city funding for their educational operations which operate and exist pursuant to the laws of the State of New York.  As such, both

Success Academy entities are state actors for purposes of 42 U. S. C. § 1983.[2]

21.     Defendant Valerie Eubanks ("Eubanks") is a White female and was, as of March 2017, an employee and agent of the Success Academy entities holding the title of Acting Principal of Success Academy's Bergen Beach location. Eubanks was acting within the scope of her employment for all actions she took relevant to the claims in this action and was a state actor for purposes of 42 U. S. C. § 1983.

22.     Defendant, the City of New York (the "City") is a municipal corporation duly organized and existing under the laws of the State of New York. The City is a "person" for purposes of the enforcement of the rights guaranteed under 42 U. S. C. § 1983. The City is authorized under the laws of the State of New York to maintain the New York City Administration for Children's Services ("ACS") and the New York City Police Department ("NYPD"), which are departments, agencies, bureaus, and subdivisions of the City. The City is the employer of Defendant Adrian Gonzalez and Defendant Delano Connolly.

23.     Christopher Mirabella,[3] who is a White male, was at all relevant times an Assistant District Attorney at the Kings County District Attorney's

---

[2] *Patrick v. Success Acad. Charter Sch., Inc.*, 354 F. Supp. 3d 185, 209 n.24 (E.D.N.Y. 2018) ("As operators of charter schools, the Success Academy Defendants are state actors for purposes of Section 1983 claims").

[3] The claims against Defendant Mirabella were rendered moot based on the Order and Report, which dismissed the claims related to this Defendant. Report at p. 37 n. 12; ECF Doc. 53.

Office, which is an official office of the State and the City of New York.

24.     Defendant Adrian Gonzalez, who is a Hispanic male, was at all relevant times a caseworker for ACS and held the title of Child Protective Specialist ("CPS").

25.     Defendant Delano Connolly,[4] who is a White male, was at all relevant times an attorney for ACS who appeared in Family Court on behalf of ACS in connection with the neglect proceedings commenced against Mr. and Mrs. Jean Charles.

## FACTS

*Success Academy*

26.     In January 2017, Success Academy informed Mr. and Mrs. Jean-Charles that they believed that RJC had learning disabilities and requested that Mr. and Mrs. Jean-Charles consent to have RJC evaluated for the purpose of classifying him as having a learning disability.

27.     Mr. and Mrs. Jean-Charles refused to consent to the proposed evaluation and objected to the proposed classification.

28.      As a result of the parent's refusal to cooperate with the school's attempt to classify RJC as having a learning disability, the school began a sustained campaign to harass the family to push RJC out of the school.

---

[4] The claims against Defendant Connolly were dismissed on absolute immunity grounds. Report at p. 38; ECF Doc. # 53.

29.     Over the course of the next two months, RJC's second-grade teacher, the assistant teacher, and the Acting Principal, Defendant Eubanks, called Mrs. Jean-Charles on a nearly daily basis during the work/school day and complained to her about minor or everyday matters pertaining to her son, such as the fact that he was not being sufficiently attentive, was hungry, was fidgeting in his seat, or was not following directions in the classroom.  Over the course of the next two months, the school raised these relatively minor matters with Mrs. Jean-Charles on about 30 separate occasions.

30.     RJC had been at the school for the past two and a half years since he started kindergarten in August 2014, and before January 2017 it was uncommon for Mrs. Jean-Charles to receive these kinds of regular reports from the school about RJC during the course of the workday.

31.     Since the regular, almost daily, reports since January 2017 were unusual and since the school was not asking Mrs. Jean-Charles to take any specific action as a result of these reports, it became clear that the purpose of the repeated calls was to convince Mrs. Jean-Charles to withdraw RJC from the school and enroll him in another school the following academic year.

32.     Third-grade students in New York State elementary schools are required to take statewide-standardized proficiency examinations.

33.     High scores on the third grade proficiency examinations are, for

Success Academy an important aspect of its image and marketing plans.

34.    As a result, Success Academy has an established policy and practice of pushing out of the school underperforming children, children with learning disabilities, and children who are perceived as having learning disabilities.

35.    In October of 2015, the *New York Times* reported that Success Academy was "long been dogged by accusations that its remarkable accomplishments are due, in part to a practice of weeding out weak or difficult students."

36.    The *Times* also reported that Success Academy maintained a "got to go" list of unwanted students at one of its schools in Fort Greene, Brooklyn who were targeted to be pushed out of the school because of their perceived or actual learning disabilities.[5]

37.    As a publicly funded charter school, Success Academy, which is the largest charter school in the City of New York, admits students based on a lottery system and must provide a seat to any child who has enrolled, unless the student voluntarily withdraws or is expelled.

38.    To expel or suspend a student on a long-term basis requires that the school comply with strict and extensive regulatory guidelines under New York

---

[5] *New York Times*, Oct. 29, 2015, K. Taylor, *At a Success Academy Charter School, Singling Out Pupils Who Have "Got to Go"* (available at https://www.nytimes.com/2015/10/30/nyregion/at-a-success-academy-charter-school-singling-out-pupils-who-have-got-to-go.html).

Education Law § 3214. Rather than complying with those guidelines, Success Academy has an established policy and practice of pushing out "undesirable" students by making their parents' lives so difficult that they withdraw.

39. Threats of suspensions, suspensions, and actual or threatened calls to 911 or to ACS are typical means whereby Success Academy weeds out unwanted students and maintains high test scores.

40. In the light of the public disclosures about Success Academy, numerous students with recognized or perceived learning disabilities brought actions against Success Academy for disability discrimination,[6] and after unsuccessful challenges to the merits of those allegations, Success Academy settled the lawsuits for substantial amounts that reflect a tacit admission of its liability for a pervasive and repugnant policy and practice of maintaining high scholastic achievement accolades at the expense of students with disabilities or perceived disabilities.

41. In *Lawton v. Success Academy Charter School, Inc.*, 15-cv-7058 (FB)(SMG) (EDNY), Judgment against Success Academy on an Accepted Offer of Judgment was entered in the amount of $1,100,000 plus reasonable legal fees in 2020 on behalf of five former students and their families, where each family

---

[6] *See, e.g. Lawton v. Success Academy Charter School, Inc.*, 15-cv-7058 (FB)(SMG), 323 F. Supp. 2d 353 (E.D.N.Y. 2018); *Patrick v. Success Academy Charter School, Inc.*, 17-cv-6846(PKC)(RML) (EDNY); *S.G. v. Success Academy Charter School, Inc.*, 18-cv-2484(KPF)(SMG) (SDNY): *Steele v. Success Academy Charter School, Inc.*, 19-cv-5659(AJN)(RWL) (SDNY).

was paid $220,000 on the disability discrimination claims against Success Academy. *Lawton, supra;* ECF Doc. ## 156-6 & 160

*The Alleged Abuse of RJC*

42.     On Monday, March 13, 2017, Success Academy informed Mr. and Mrs. Jean-Charles that RJC had misbehaved that day in school by using offensive language.

43.     On Tuesday, March 14th, both children were home for a snow day under the care of their father, Mr. Jean-Charles.  As discipline for misbehaving at school, Mr. Jean-Charles told RJC that he could not have his favorite food and that he would be served oatmeal.   RJC objected, threw his oatmeal in the garbage, and ran upstairs.  While running, RJC tripped and fell, slightly bruising his upper lip.

44.     On Wednesday, March 15, 2017, RJC went to school with a slightly swollen upper lip.

45.     Upon information and belief, using suggestive and leading questions, Eubanks coached RJC into saying that his father had recently punished him for acting out at school that week and that as a result of that punishment the father caused the swollen lip.  As the suggestive and leading questioning progressed, Eubanks led RJC to say, upon information and belief, that his father beat him and that the swollen lip was caused by the beating.  Based on these

questions and based on RJC's innocent desire to accommodate Eubanks' manipulative suggestions, RJC was led to make up a facially fanciful story that any reasonably competent investigator would have known was a fabrication: According to reports later received by Mr. and Mrs. Jean-Charles, RJC said that his father had whipped him "at least six times" with a belt, punched him in the stomach, and stomped on RJC's face while he was lying on his back on the floor.

46.     Upon information and belief, the school authorities, including Eubanks, used their leading and suggestive questioning techniques to encourage RJC to make up this story and then reported that story to the authorities.

47.     Other than a slightly swollen lip, however, there was no physical evidence to corroborate this story.  RJC did not have any bruises on his body; did not walk, sit, or speak in any manner suggesting that he had just been severally beaten by a grown man; and a photograph of RJC taken that day shows no injuries to RJC's face, other than the slightly swollen upper lip.

48.     Although the school had been repeatedly contacting Mrs. Jean-Charles on a near daily basis since January 2017, Defendant Eubanks, who was the Acting Principal at the time, did not make any attempt to contact Mr. or Mrs. Jean-Charles.  Instead, Defendant Eubanks used the fabricated story as a basis to inform the New York State Central Registry that she suspected that his parents were physically abusing RJC at home.

49. There was no basis for making the abuse report based on how RJC presented himself at school that day.

50. According to an expert psychologist appointed by the Family Court, Dr. Jamila Codrington, the story by RJC about his father beating him was a distortion of facts created by adult coaching of a very young and impressionable child who wanted to provide answers to questions that conformed the truth to the facts that the adult was suggesting to him.

51. There was no basis for making the abuse report based on anything in the school's known history of RJC and his parents. There had never been any prior claim or suggestion of abuse of RJC; both parents were actively involved in the care and education of RJC; and RJC's attendance at school was good. Both parents were regularly involved in the care of their children, and Mr. Jean-Charles regularly brought the children to school in the morning and to church on Sundays, facts known to the school and easily established by a reasonably competent investigator.

52. Once the Central Register report was made, officers of ACS, including Defendant Gonzalez, responded to the call.

53. Gonzalez went directly to the school and immediately seized, detained, and interrogated RJC without contacting either parent or seeking their permission.

54.     At the interview, RJC presented himself as a polite, well dressed, child wearing a school uniform with a slightly swollen upper lip.

55.     Upon information and belief, Gonzalez also interrogated RJC in a leading and suggestive manner to encourage RJC to confirm and further fabricate the story created by Eubanks about how his father brutally beat him on Tuesday, March 14.

56.     During Gonzalez's interview of RJC, RJC told Gonzalez that his father often disciplined him at home by making him hold "a can of paint over his head for an hour and a half," which is physically impossible, and that the most recent time RJC was disciplined in that manner was "twice recently last weekend."

57.     Any reasonably competent investigator would have realized that the beating and discipline stories were fabrications by a seven-year-old boy who was eager to please his interrogators by telling the questioner what the child believed the questioner wanted him to say.

58.     Gonzalez persisted in conducting his "investigation" even though he knew that the statements by RJC were not credible.  He also persisted in his investigation even though he knew that none of the "suspects" had any relevant criminal history or any kind of prior history of abuse allegations and even though the school informed him that they had no knowledge of any fact that suggested or

corroborated a suggestion of abuse at home or elsewhere.

59. Although a school nurse was available to conduct a physical examination of RJC, which would have proven that the beating story was false, Gonzales did not arrange for any physical examination of RJC or conduct any other kind of evaluation or examination to corroborate the beating story, which was inconsistent with established procedures in cases of suspected abuse.

60. Gonzalez utterly failed to conduct any kind of reasonable investigation into the veracity of any of RJC's statements, contrary to established investigative procedures.

61. Gonzalez should have terminated further investigation in the light of the obvious falseness of the beating story.

62. Upon information and belief, Gonzales targeted the Jean-Charles family for investigation and for subsequent removal and neglect proceedings, based on racist stereotypes.

63. Rather than drop the matter, Gonzalez contacted both parents by telephone, ordered them to come immediately to the school, and directed them to bring with them their younger son, DJC, which they did. In his separate calls to the alarmed parents, Gonzalez purposefully and cruelly refused to provide either parent with any kind of information about the reasons for his call.

64. When Mr. Jean-Charles appeared at the school's principal's office,

both Eubanks and Gonzalez refused Mr. Jean-Charles's request to speak to RJC, who was being detained in a separate room by Defendant Eubanks and/or other Success Academy personnel. Gonzalez told Mr. Jean-Charles that the entire family had to go "downtown" with him to be interrogated about RJC, again without explaining what the matter was about or concerning.

65.     Mr. Jean-Charles asked if he was being arrested and Gonzalez said that he was not being arrested.  At that point Gonzalez knew that he was going to arrange to have Mr. Jean-Charles charged with criminal abuse but purposefully declined to inform Mr. Jean-Charles that he was the target of criminal charges.

66.     Mr. Jean-Charles immediately called an attorney he knew and informed Gonzalez that he knew his rights, that his rights were being violated, and that he was not going to answer any questions without the presence of his attorney.

67.      Gonzalez told Mr. Jean-Charles that Mr. Jean-Charles had to go downtown and that his children would be removed from his custody and that of his wife if he did not "cooperate" with Gonzalez and agree to be further questioned "downtown."

68.     A few minutes later, Mrs. Jean-Charles arrived at the school with DJC, and Gonzalez also told her that if she did not accompany Gonzalez with the children and Mr. Jean-Charles "downtown" then he would simply take custody

of the two very young children.

69.     Having no meaningful choice after being told by an officer of the State that he either cooperate or lose custody of his two children, Mrs. Jean-Charles and the children accompanied Gonzalez to an unmarked office building located at 45 Nevins Street, Brooklyn, New York, and Mr. Jean-Charles followed in another vehicle.

70.     On the drive downtown, Mrs. Jean-Charles provided Gonzalez with background medical information on both children.  When Mrs. Jean-Charles said that DJC had allergies, Gonzalez asked in a racially discriminatory, mocking, and insulting manner whether DJC was allergic to "roaches," a demeaning way of insinuating that the family lived in poverty and that the children were not properly cared for.

71.     Upon information and belief, Gonzalez and other ACS caseworkers regularly equated persons of color with actual or perceived poverty, such that being a person of color created a presumption of abuse and neglect.

72.     Upon information and belief, Gonzalez and other ACS caseworkers regularly equated persons of color and with child abuse and neglect, such that being a person of color created a presumption of abuse and neglect.

73.     Upon information and belief, Gonzalez and other ACS caseworkers regularly use racist stereotypes about persons of color in order to draw

unjustified conclusions and presumptions about the existence of abuse and neglect.

74. When Gonzalez suggested that DJC was allergic to roaches he was invoking a demeaning and false stereotype about the connection between persons of color, poverty and abuse of children.

75. Once the family arrived at 45 Nevins Street, Gonzalez took the two boys into a separate part of the building and brought the parents to a holding area in another area in the building.

76. Upon information and belief, while the parents waited in the holding area for about an hour, Gonzalez and others from ACS placed each child alone in separate interrogation rooms.

77. Upon information and belief, while RJC was alone in the interrogation room, Gonzalez told RJC that his father was going to "get what he deserves" and that he was going to be wearing an "orange jumpsuit" soon, which was a direct statement by an official of the State that Mr. Jean-Charles had committed a crime and was going to prison.

78. Mr. Jean-Charles was later placed alone in another interrogation room and questioned by either an ACS officer or a member of the NYPD. Mr. Jean-Charles again insisted on his right to have counsel present but the interrogator denied that request and Mr. Jean-Charles was coerced by fears of

losing custody of his children into making statements to the interrogator about acceptable types of discipline and punishment of children. At about 9:00 PM that evening, Mr. Jean-Charles was arrested, handcuffed, processed and taken to Central Booking in Brooklyn, where he was detained for about 24 hours until his arraignment the following evening.

79.     While being detained, Mr. Jean-Charles was physically attacked and injured by an inmate and suffered serious physical injuries from the attack as well as prolonged emotional trauma from the assault.

80.     Mrs. Jean-Charles was also placed in an interrogation room alone, and Gonzalez continued to press her to answer questions about "what happened to" RJC.  Mrs. Jean-Charles explained that her understanding was that RJC had fallen while in the home.  She also explained that she was at work at the time and that her husband was home when it happened.  When Gonzalez informed her that Mr. Jean-Charles was suspected of beating RJC, Mrs. Jean-Charles informed Gonzalez that she did not want to answer any further questions without the presence of an attorney.

81.     Shortly after Mr. Jean-Charles was arrested, Gonzalez released the children into the custody of their mother and at the same time told Mrs. Jean-Charles that if she did not cooperate with Gonzalez, he was going to again take physical custody of the children.  Gonzalez also "invited" Mrs. Jean-Charles to

attend a meeting the next day at ACS's offices and told her that she should have the RJC medically evaluated.

82. The next morning, March 16th, Mrs. Jean-Charles informed Gonzalez by telephone that she was not going to attend the ACS meeting and that she was going to take RJC to his pediatrician.

83. In response, Gonzalez vindictively and maliciously determined to further punish the family for failing to attend the meeting by seeking to remove custody of the children from their mother.

84. Later that day, Gonzalez learned that Mrs. Jean-Charles took RJC to his pediatrician and that the medical records reflected that other than the swollen upper lip, there was no other bruising on RJC's body and that there were no injuries consistent with whipping, punching, or beatings.

*The Neglect Proceedings against Mr. and Mrs. Jean-Charles*

85. On March 16th, Gonzalez maliciously prepared and filed with the New York City Family Court, with the assistance of Defendant Delano Connolly, an emergency Neglect Petition against both Mr. and Mrs. Jean-Charles, requesting an immediate order of removal of custody.

86. The Neglect Petition, which was verified by Gonzalez and filed by Connolly, contained several material misstatements of fact and omissions of material facts, including the following: (a) Gonzalez and Connolly falsely

asserted or suggested that Mr. Jean-Charles struck RJC at least six times in the "butt" with a belt, punched RJC in the stomach, and "stepped" on RJC's mouth, without also informing the Family Court that none of RJC's injuries were consistent with the story purportedly told by a seven year old child or the medical evidence; (b) Gonzalez and Connolly false asserted and suggested that Mrs. Jean-Charles told her husband that "he cannot engage in these actions anymore" and that, based on that alleged statement, she was aware of the alleged abuse and failed to take proper steps to protect her children; (c) Gonzalez and Connolly falsely asserted that Mrs. Jean-Charles was neglectful when she did not seek medical care for RJC's (nonexistent) "injuries" and only placed ice on his "injured" lip; and (d) Gonzalez and Connolly failed to disclose the statement by RJC to the effect that his father often and recently disciplines him by making him hold a can of paint over his head for an hour and a half.

87.    Based on these material misrepresentations and omissions, the Family Court issued an order removing custody of the two children from their parents and temporarily placing physical custody with their paternal aunt, who also lived in Brooklyn.

88.    The forced separation on March 16 further traumatized RJC, DJC, and the parents.

89.    That same day, March 16, the New York City Department of

Education sent Mr. Jean-Charles a letter informing him that the Department of Education had been informed of his arrest the evening of March 15th and that, pending the resolution of the abuse charges against him, Mr. Jean-Charles was suspended from any of his work-related activities for persons in sensitive or vulnerable categories, such as children and the elderly.

90.     As a result of that suspension, Mr. Jean-Charles was not able to work in his chosen and established profession, which was providing and supervising the providing of physical therapy to children and the elderly.

91.     As a result of the loss of income, the entire family suffered financially and emotionally due to the uncertainty and anxiety about the father's ability to continue to provide financial support for the family.

92.     The following day, March 17, the Family Court issued an order of protection directing that Mr. Jean-Charles stay away from his children and his home based on the false and misleading Neglect Petition.

93.     In addition, the Family Court modified the order regarding Mrs. Jean-Charles's custody of her children to permit the children to return home, provided that the mother cooperated with ACS supervision, assisted in enforcing the stay-away order on her husband, refraining from speaking to her children about the Family Court case or the Criminal Court case, took the children to therapy and attended therapy herself.

94.     As a result of the orders from the Family Court, Mr. Jean-Charles was required to move out of the home and to reside elsewhere.

95.     As a result of the orders of the Family Court, both children had assigned counsel appointed to represent them.  Mr. Jean-Charles and Mrs. Jean-Charles were required to retain at their own expense their own counsel to represent Mr. Jean-Charles in the criminal case and each of them in the family court proceedings.

96.     As a result of the orders of the Family Court, RJC, DJC, and their parents suffered extreme anxiety over the instability within the family, and the bonds of trust that the children had toward their parents were damaged.

97.     In May 2017, Gonzalez informed the New York State Central Register maliciously and in bad faith that he had concluded that Mr. Jean-Charles had physically abused RJC and that Mrs. Jean-Charles was aware of the abuse and failed to protect the children.

98.     As a result of that report, the New York State Office of Children and Family Services is required as a matter of law to inform interested parties of the existence of the "indicated" finding, and any prospective employer or licensor in any relevant line or work must, as a matter of law, inquire to the Central Register about the existence of any such indicated finding for all such prospective employees or licensees.

99.     For the next four months (the second half of March, April, May, and June 2017) RJC and DJC were only permitted limited and supervised visits with their father, first at the offices of ACS and in the presence of an ACS caseworker, then supervised visits of a limited duration at the home, and finally visits with the children at the family home only under the supervision of their mother.

100.    For a total of at least 125 days, Mr. Jean-Charles was not permitted to live at home with his wife and children, a major physical and emotional disruption of the family unit.

101.    Throughout the spring of 2017, Success Academy continued its campaign to coerce RJC's parents to withdraw RJC from school with more needless complaints and a series of groundless or excessive suspensions of RJC on March 28, 2017, April 20, 2017, and May 30, 2017.  For the last trimester of the second grade, RJC was suspended on at least five occasions whereas for the past eight trimesters RJC had only received a total of two suspensions for that entire period of two and two-thirds years.

102.    In addition, soon after the March 15 incident at school, Eubanks falsely reported to Gonzales that Mrs. Jean-Charles had failed to appear for meetings with the school about RJC in a discriminatory malicious effort to suggest that the mother was not acting in a proper manner in connection with the care of her child and to make even more clear to the family that RJC should

simply withdraw from the school.

103.   The separation of the children from their father, the classification of the father as a criminal and an abusive parent, and the ongoing events surrounding the repeated intrusions by school officials, ACS investigators, law enforcement officers and professional therapists caused significant emotional, physical and financial damage to RJC, DJC and the integrity of the Jean-Charles family as a whole.

104.   In early June 2017, Gonzalez submitted a report to the Family Court on the status of the Jean-Charles matter.  In his written report, Gonzalez maliciously, vindictively, and falsely informed the Court at a recent home-visit that "RJC did not feel comfortable" speaking to Gonzalez in the presence of his RJC's mother and/or his aunt and that RJC "wanted to speak with [Gonzalez] privately."

105.   Gonzalez also falsely stated in his court report that he did not speak privately with RJC because Mrs. Jean-Charles objected, when in fact Mrs. Jean-Charles stated that she did not feel comfortable permitting Gonzalez to speak privately with RJC without any record of the discussion and suggested that a private interview between Gonzalez and RJC be recorded, a suggestion rejected by Gonzalez.

106.   Mrs. Jean-Charles had good reason to be concerned about permitting

Gonzalez to speak privately with RJC because on the night of her husband's arrest, Gonzalez basely suggested that the children's home was infested with roaches and Gonzalez specifically told RJC during a private interrogation at 45 Nevins Street that his father was going to "get what he deserves" and will end up in prison in an "orange jumpsuit." On the occasion of another intrusive home-visit, Gonzales even suggested to Mrs. Jean-Charles that the only reason she was married to Mr. Jean-Charles was because he was a successful doctor with an advanced degree.

107. Based on Gonzalez's false report to the Family Court, on June 5, 2017, the Family Court issued an order authorizing Gonzalez to speak to RJC outside the mother's presence.

108. Fortunately, later that month, the Jean-Charles matter was re-assigned within the offices of ACS to a new caseworker, Oasia Davis-Walker.

109. Shortly after being assigned to the matter, the new caseworker informed Mr. Jean-Charles that Defendant Connolly, the ACS lawyer prosecuting the Family Court proceedings, was out to get Mr. Jean-Charles.

110. The new caseworker told Mr. Jean-Charles that Defendant Connolly told the new caseworker to try to get Mr. Jean-Charles to admit that he physically abused his son and that, if Mr. Jean-Charles would acknowledge his wrongdoing to the caseworker, then the outstanding neglect matters could be resolved

amicably.

111.   The new caseworker told Mr. Jean-Charles that it was improper office procedure for Connolly to use a caseworker to extract admissions against a respondent in a pending Family Court matter.

112.   Indeed, using the caseworker to obtain information from an opposing party in a Criminal Court and a Family Court matter violated Mr. Jean-Charles's Sixth Amendment right to counsel, his Fifth Amendment right to remain silent, and his Fifth and Fourteenth Amendment right to due process.

113.   In June of 2017, Defendant Christopher Mirabella, the Kings County District Attorney, asked Mrs. Jean-Charles for permission to interview RJC privately, and Mrs. Jean-Charles informed Mirabella that she objected and that RJC had his own attorney who should be contacted by Mr. Mirabella.

114.   Against the express wishing of the mother and in violation of RJC's own right to counsel, Mirabella went to RJC's school and with the assistance of Success Academy personnel, including upon information and belief, Defendant Eubanks, Mirabelle seized, detained, and interrogated RJC about the abuse allegations and obtained a "supporting deposition" signed by RJC on about June 9, 2017.

115.   The supporting deposition, which was captioned *People v. Hugue Jean-Charles*, Kings Criminal Court, Docket # 2017KN015634, states that RJC

has "read the accusatory interment" and states that the "facts in that instrument stated to be on information furnished by me are true to my personal knowledge." The deposition, which was not signed in the presence of a notary or any other specified witness, also recites that false statements made in the document are punishable as a misdemeanor under the Penal Law.

116. Defendant Mirabella obtained the deposition in violation of RJC's right to counsel.

117. Defendant Mirabella unlawfully detained and coerced a seven-year-old child to sign a false statement in order to assist Mirabella in seeking a criminal conviction of the father, causing further damage to RJC's relationship and bond with his father.

118. Defendant Mirabella obtained the deposition by coercive and improper means from a seven-year-old child without undertaking any of the steps required to ascertain, on notice to all parties, the ability of the child to understand the oath pursuant to N.Y. Crim. Pro. Law § 60.20(2) ("A witness less than nine years old may not testify under oath unless the court is satisfied that he or she understands the nature of the oath.").

119. Later that month, RJC withdrew from Success Academy as a student and enrolled in a different elementary school.

120. In about the third week of July 2017, Mr. Jean-Charles was

permitted to return home.

121.   On or about August 8, 2017, the Criminal Court case against Mr. Jean-Charles was dismissed on the motion of the Kings County District Attorney's Office on the stated ground that People were not prepared to proceed with the case.

122.   Two months later, on October 2, 2017 the Family Court proceedings were adjourned for six months in contemplation of a dismissal on April 2, 2018, provided that Mr. and Mrs. Jean-Charles agree to ACS continue supervision and continue to abide by a limited order of protection prohibiting any corporal punishment of the children.

123.   On June 13, 2018, after a hearing before an administrative law judge of the New York State Office of Children and Family Services, the initial finding of abuse based on an "indicated" finding, triggered by the report of abuse by Defendant Eubanks to the New York State Central Register, was finally reversed.

124.   In its decision, the administrative law judge noted that according to the court-appointed expert and therapist, Dr. Jamila Codrington, RJC was easily (and likely coached) to avoid punishment at school and that the abuse report by the school was a distortion.   The decision also noted that there was no evidence to corroborate the beating story and that RJC simply misbehaved at school, lied to his father about eating oatmeal, ran away when caught, and fell.

125.    Eventually, Mr. Jean-Charles was able to resume his practice but as a result of the Defendants' conduct, the family suffered a significant loss of income and wealth in an amount estimated to be over $300,000.

126.    All limitation periods and notice requirements governing the claims by RJC and DJC have been and are tolling pursuant to CPLR § 208 on the grounds that they were and still are infants.  The limitations and notice periods governing the claims by Mr. and Mrs. Jean-Charles should be tolled pursuant to the Governor's Executive Orders addressing the COVID pandemic and through June 13, 2018 the ground that the Defendants took actions to threaten to remove custody of RJC and DJC from Mr. and Mrs. Jean-Charles unless the parents continued to cooperate with them in connection with the multiple proceedings filed against them.

**FIRST CLAIM FOR RELIEF**
**VIOLATION BY ALL DEFENDANTS OF**
**ALL PLAINTIFFS' RIGHTS UNDER 42 U. S. C. § 1983 and THE NEW**
**YORK STATE CONSTITUTION**
**(Right to Family Integrity)**

127.    Plaintiffs repeat, reiterate and realleges each and every foregoing allegation with the same force and effect as if fully set forth herein.

128.    At all relevant times, all Defendants were state actors acting within the scope of their employment.

129.    All Defendants, jointly and severally, violated Plaintiffs' rights to

family integrity by the shocking abuse of the powers of government in violation of the fundamental rights of each and every member of the Jean-Charles family to exist in an unmolested state, as protected by the United States Constitution and the New York State Constitution.

130.     Based on patently false allegations, the Jean-Charles family was damaged by the traumatic events that unfolded in the spring and summer of 2017 (*i.e.,* their seizures, arrests, and custodian interrogations; the grant of a petition to remove parental custody of RJC and DJC; the grant of an order of the Family Court that required the father to vacate the home for 125 days; the criminal prosecution of the father; and the suspension of the father's ability to work as a doctor in the physical therapy field). Ultimately, the bogus Criminal Court, Family Court, and New York State Child Registry proceedings were terminated in favor of the Jean-Charles family, but the damage to the family unit was done.

131.     All Defendants conspired and worked together in a coordinated effort to violate the Plaintiffs' fundamental rights to family integrity under the United States Constitution and the New York State Constitution.

132.     The Defendants' conduct and actions against the Jean-Charles family ignored overwhelming exculpatory evidence and manufactured false evidence to justify their actions.

133.     The Defendants' conduct was so shocking, vindictive, egregious and

arbitrary that it violated the community's conscience.

134.   As a result of the Defendants' conduct, they are each jointly and severally liable to Plaintiffs for the financial and severe emotional damage that they caused to the Jean-Charles family in an amount to be established at trial.

**SECOND CLAIM FOR RELIEF**
**VIOLATION BY ALL DEFENDANTS OF**
**ALL PLAINTIFFS' RIGHTS UNDER 42 U. S. C. § 1983 AND THE NEW**
**YORK STATE CONSTITUTION**
**(Right to Due Process)**

135.   Plaintiffs repeat, reiterate and realleges each and every foregoing allegation with the same force and effect as if fully set forth herein.

136.   All Defendants, jointly and severally, violated Plaintiffs' rights to substantive and procedural due process under the United States Constitution and the New York State Constitution when they, jointly and severally, abused the powers of government in bad faith and without justification or probable cause in violation of the fundamental rights of each and every member of the Jean-Charles family to exist in an unmolested state, as protected by the Fourth and Fourteenth Amendments to the United States Constitution and the due process clause set forth in Article One, Section 6 of the New York State Constitution.

137.   All Defendants conspired and worked together in a coordinated effort to violate the Plaintiffs' fundamental rights to family integrity.

138.   As a result of the Defendants' conduct, they are each jointly and

severally liable to Plaintiffs for the financial and severe emotional damage that they caused to the Jean-Charles family in an amount to be established at trial.

## THIRD CLAIM FOR RELIEF
## UNDER 42 U. S. C. § 1983 AND THE NEW YORK STATE CONSTITUTION
### (Right Against Unlawful Seizure)

139.   Plaintiffs repeat, reiterate and reallege each and every foregoing allegation with the same force and effect as if fully set forth herein.

140.   All Defendants violated the Plaintiffs' individual rights to liberty and freedom under the Fourth and Fourteenth Amendments to the United States Constitution and Article One, Section Twelve of the New York State Constitution when Plaintiffs RJC and DJC were seized by and falsely arrested by the Success Academy entities, Eubank, and Gonzalez on March 15, 2017;  and thereafter and when Gonzalez, aided and abetted by other officers of the City of New York and the NYPD, seized and falsely arrested all four Plaintiffs, took then to 45 Nevins Street and held and interrogated them against their will without probable cause or justification; and when on about June 9, 2017 RJC was seized at the school.

141.   The unlawful arrests, seizures and restraints on the Plaintiffs' rights to liberty and to be free from unreasonable seizures continued throughout the Criminal Court and Family Court proceedings in that the orders from those courts limited the rights and freedoms of each of the Plaintiffs to speak with, be in the presence of, and live together as a family under normal and unrestricted

circumstances.

142.   As a result of the Defendants' conduct, they are each jointly and severally liable to Plaintiffs for the financial and severe emotional damage that they caused to the Jean-Charles family in an amount to be established at trial.

**FOURTH CLAIM FOR RELIEF**
**UNDER 42 U. S. C. § 1983 AND THE NEW YORK STATE**
**CONSTITUTION**
**(Right to Counsel and Right to Remain Silent)[7]**

143.   Plaintiffs repeat, reiterate and reallege each and every foregoing allegation with the same force and effect as if fully set forth herein.

144.   Defendants, the City of New York, Gonzalez, Connolly, Eubanks and Mirabella violated the Plaintiffs' rights to counsel and their rights to remain silent and to be free from self-incrimination under the Fifth and Sixth Amendments to the United States Constitution and the New York State Constitution when they engaged in the following actions:  (a) when Gonzalez retaliated against all the Plaintiffs because Mr. Jean-Charles invoked his right to counsel while at the school on March 15, 2017 and by arresting or causing the arrest of Mr. Jean-Charles and instituting and initiating criminal and family court proceedings against the Plaintiffs; (b) when Gonzalez told Mr. and Mrs. Jean-Charles that if they did not cooperate with him he was going to take RJC and DJC into his custody; (c) when

---

[7] Pursuant to the Order and the Report, this claim was dismissed for failure to state a claim for relief.  Report at pp. 29-30; ECF Doc. 53.

Gonzales and other employees and agents of the City of New York coerced Mr. and Mrs. Jean-Charles into speaking to law enforcement officers after they invoked their right to counsel and to remain silent; (d) when Connolly used a caseworker at ACS to interrogate Jean-Charles and attempted to extract under false pretenses damaging statements of culpability at a time when Connolly knew that Mr. Jean-Charles had counsel and knew that Mr. Jean-Charles was in a vulnerable position who wanted to end the gross disruption to his family; and (e) when Mirabella went to RJC's school without consent and knowing that RJC had assigned counsel and coerced, with the assistance of Eubanks, a signed statement by RJC implicating his father in a crime.

145.    As a result of the Defendants' conduct, they are each jointly and severally liable to Plaintiffs for the financial and severe emotional damage that they caused to the Jean-Charles family in an amount to be established at trial.

## FIFTH CLAIM FOR RELIEF
## UNDER 42 U. S. C. § 1983 AND THE NEW YORK STATE CONSTITUTION
### (Stigma-Plus Right to Liberty and Livelihood)[8]

146.    Plaintiffs repeat, reiterate and reallege each and every foregoing allegation with the same force and effect as if fully set forth herein.

147.    All Defendants violated the rights of Mr. Jean-Charles to liberty and

---

[8] Pursuant to the Report, this claim by Mr. Jean-Charles was dismissed on limitation grounds. Report at p. 11-12.

to engage in his livelihood and profession in violation of his due process rights under the Fourth and Fourteenth Amendments to the United States Constitution and the due process clause of Article One, Section Six of the New York State Constitution.

148. By instating in bad faith and without justification proceedings in Criminal Court and Family Court and by filing and confirming a false and bogus report of child abuse with the New York State Central Register, the Defendants damaged Mr. Jean-Charles' means of supporting himself and his family, which involved working with children and seniors.

149. The Defendants' conduct worked a severe damage to the good name and reputation of Mr. Jean-Charles and deprived him of a tangible interest in his ability to work and in his prospects for employment.

150. The Defendants' action created a stigma around Mr. Jean-Charles that caused him damages and curtailed his right to liberty.

151. As a result of the Defendants' conduct, they are each jointly and severally liable to Plaintiffs for the financial and severe emotional damage that they caused to the Jean-Charles family in an amount to be established at trial.

**SIXTH CLAIM FOR RELIEF**
**(Race Discrimination Under Federal Law and**
**the New York State Constitution)**

152. Plaintiffs repeat, reiterate and reallege each and every foregoing

allegation with the same force and effect as if fully set forth herein.

153.   The Defendants, Success Academy,[9] Eubanks, The City of New York, Gonzalez, Connolly, and Mirabella violated the Plaintiff's rights under 42 U. S. C. § 1981, 42 U. S. C. § 1983, and under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article One, Section Eleven of the New York State Constitution when they purposefully and intentionally employed racist stereotypes about persons of color, actual or perceive poverty and the existence of abuse and neglect of children and took the actions alleged above against the Jean-Charles family.

154.   The allegations pressed by the City Defendants against the Jean-Charles family were driven by racist stereotypes, not evidence, and the objective facts would have made it clear to any reasonably competent investigator that the physical abuse allegations were the product of misleading and coercive questioning of an intimidated seven-year-old who was simply confirming the suggestive questions being put to him by Eubanks and Gonzalez.

155.   Although persons of color constitute about 60% of the population in New York City, the percentage of persons of color subject to allegations of childhood abuse and neglect by ACS is nearly 90% persons of color.

156.   The targeting by ACS of persons of color for investigation of abuse

_____

[9] Pursuant to the Order and Report, the claims for race discrimination against the School Defendants, but not the other Defendants, were dismissed.  Report at p. 30 n. 10; ECF Doc. # 53.

and neglect is and was at times relevant to this complaint pervasive within ACS.

157.   As a result of that pervasive practice, persons of color were presumed to be guilty of abuse and neglect whereas White persons who were otherwise similarly situated to persons of color were presumed to be innocent of allegations of abuse and neglect and were prosecuted or subject to neglect or removal proceedings only when credible evidence showed that the allegations were true or were likely to be true.

158.   The City of New York and ACS's senior policymakers knew that officers and agents of ACS acted based on stereotyping of people of color.

159.   The City of New York and ACS's senior policymakers failed to take adequate steps to discipline its members who engaged in discriminatory conduct against persons of color.

160.   As a result, the City of New York is liable to Plaintiffs because it created, fostered and maintained an "anything goes" policy and practice within the ACS in terms of the practice of unfairly targeting persons of color.

161.   The City of New York is liable to Plaintiffs because the injuries to Plaintiffs were the direct and proximate result of de facto City policies and practices in existence at the time of the actions, which included, among other things: (a) long-standing and intentional practice of racism within the ranks of ACS; (b) City and ACS policymakers, who are predominately white, condoning,

encouraging, and acquiescing in a longstanding and widespread practice among ACS personnel of targeting persons of color; (c) deliberate indifference and willful blindness by ACS and his executive staff to the fact that caseworkers were regularly employing racist stereotypes in the investigation and prosecution of allegations of abuse and neglect.

162. The City of New York is liable to Plaintiffs for the unlawful conduct of its ACS caseworkers, lawyers and other employees directed against the Jean-Charles family. ACS and its senior officers and policy-makers knew to a moral certainty that their employees would confront a situation where persons of color would be investigated and prosecuted based on racist stereotypes; that these situations presented ACS staff with a difficult choice of the sort that proper discipline, training and supervision can ameliorate and make less difficult; and that the wrong choices by ACS employees and supervisors will frequently cause a deprivation of the constitutional rights of persons of color.

## SEVENTH CLAIM FOR RELIEF
### (Malicious Prosecution under Federal, State, and Common Law

163. Plaintiffs repeat, reiterate and reallege each and every foregoing allegation with the same force and effect as if fully set forth herein.

164. The Defendants are liable pursuant to 42 U. S. C. § 1983, the New York State Constitution, and the common law of the State of New York to each of the Plaintiffs for malicious prosecution arising from the proceedings initiated by

the Defendants in Criminal Court, Family Court and the New York State Office of Children and Family Services and the New York State Central Register.

165.   Those proceedings were initiated in bad faith and without probable cause to believe that the claims would succeed.

166.   Those proceedings were initiated for malicious reasons.

167.   Those proceedings were terminated in favor of the Plaintiffs.

168.   As a result of the Defendants' conduct, they are each jointly and severally liable to Plaintiffs for the financial and severe emotional damage that they caused to the Jean-Charles family in an amount to be established at trial.

## EIGHTH CLAIM FOR RELIEF
**(Malicious Abuse of Process under Federal and State Law)**

169.   Plaintiffs repeat, reiterate and reallege each and every foregoing allegation with the same force and effect as if fully set forth herein.

170.   The Defendants are liable pursuant to 42 U. S. C. § 1983, the New York State Constitution, and the common law of the State of New York to each of the Plaintiffs for malicious abuse of process arising from the proceedings initiated by the Defendants in Criminal Court, Family Court and the New York State Office of Children and Family Services and the New York State Central Register.

171.   The Defendants employed regularly issued legal process to compel performance or forbearance of an act with the intent to do harm to Plaintiffs without excuse or justification and in order to obtain a collateral objective that was

outside the legitimate ends of that legal process, thereby causing a deprivation of liberty to Plaintiffs.

172.   As a result of the Defendants' conduct, they are jointly and severally liable to Plaintiffs for financial and severe emotional damages in an amount to be established at trial.

## NINTH CLAIM FOR RELIEF
### (Disability Discrimination Under Federal and Local Law)

173.   Plaintiffs repeat, reiterate and reallege each and every foregoing allegation with the same force and effect as if fully set forth herein.

174.   The Success Academy entities are recipients of funding from federal, state and local government sources.

175.   The School Defendants are jointly and severally liable to the Plaintiffs on the ground that they intentionally discriminated against RJC on the grounds that he was perceived to have a learning disability that substantially limited his ability to learn and to read and was disabled with the meaning of Section 504 of the Rehabilitation Act, 29 U. S. C. § 794 & 794a, within the meaning of the Americans With Disability Act, 42 U. S. C. §§ 1201 & 12132, and within the meaning of the New York City Administrative Code, Title 8, § 8-107(4) & § 8-502.

176.   Plaintiffs have served a copy of their pleading on the New York City Commission on Human Rights in accordance with New York City Administrative Code, Title 8, § 8-502.

177.    As a result of the Defendants' conduct, they are jointly and severally liable to Plaintiffs for financial and severe emotional damages in an amount to be established at trial.

## TENTH CLAIM FOR RELIEF[10]
### (Intentional Infliction of Emotional Distress)

178.    Plaintiffs repeat, reiterate and reallege each and every foregoing allegation with the same force and effect as if fully set forth herein.

179.    The Defendants are liable to the Plaintiffs for intentional infliction of emotional distress on each of the Plaintiffs who each suffered serious and severe emotional trauma caused by the Defendants' shocking and unconscionable conduct.

180.    As a result of the Defendants' conduct, they are jointly and severally liable to Plaintiffs for financial and severe emotional damages in an amount to be established at trial.

## ELEVENTH CLAIM FOR RELIEF
### (Recklessness, Gross Negligence and Negligence)

181.    Plaintiffs repeat, reiterate and reallege each and every foregoing

---

[10] The Order and Report recommended that Plaintiffs RJC's and DJC's claims the New York common law claims against the City of New York and the Success Academy Defendants be dismissed without prejudice on the ground that the Court lacked the authority to grant Plaintiffs leave to file a late notice of claim on behalf of Plaintiffs RJC and DJC, whose claims are not barred by the limitations periods due to the infant tolling provision of CPLR 208. Report at p. 16 -17; ECF DOC. # 53. Accordingly, Plaintiffs have filed a Petition with the Supreme Court of the State of New York for leave to file late notice against the Defendants on the ground that the limitation periods for filing a notice of claim are subject to the tolling provisions of CPLR § 208. *Id.* at p. 16.

allegation with the same force and effect as if fully set forth herein.

182.　The Defendants owed a duty of care and loyalty to the Plaintiffs.

183.　The Success Academy entities failed to train or supervise Eubanks on her duties owed to RJC.

184.　The City of New York failed to train or supervise Gonzalez or Connolly on their duties owed to RJC.

185.　The Defendants breached that duty of care and loyalty owed to the Plaintiffs.

186.　The Defendants are liable to the Plaintiffs for their reckless, grossly negligent and negligent conduct.

187.　As a result of the Defendants' conduct, they are jointly and severally liable to Plaintiffs for financial and severe emotional damages in an amount to be established at trial.

## TWELFTH CLAIM FOR RELIEF
### (false arrest and seizure)

188.　Plaintiffs repeat, reiterate and reallege each and every foregoing allegation with the same force and effect as if fully set forth herein.

189.　The Success Defendants and the City Defendants falsely arrested and unlawfully seized RJC, DJC and the parents in violation of their rights under the common law of the State of New York and Article One, Section Twelve of the New York State Constitution.

190.    As a result of the Defendants' conduct, they are jointly and severally liable to Plaintiffs for financial and severe emotional damages in an amount to be established at trial.

## JURY DEMAND

191.    Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand the following relief:

A.    Compensatory damages in an amount to be determined at trial;

B.    Punitive damages in an amount to be determined at trial;

C.    Declaratory judgment in favor of Plaintiffs and against each of the Defendants, finding that the Defendants' conduct was unlawful and that the Success Defendants forfeit any and all improperly received gains;

D.    An award of reasonable attorney's fees pursuant to 42 U. S. C. § 1988 and NYC Adm. Code § 8-502 as well as costs and disbursements; and

E.    Any further relief as the Court may find just and proper.

Dated:  New York, New York
         November 6, 2024

                              BY:   *s/Nathaniel B. Smith*
                                    _____
                                    NATHANIEL B. SMITH
                                    225 Broadway –Suite 1901
                                    New York, New York 10006
                                    (212) 227-7062
                                    natbsmith@gmail.com